# EXHIBIT 1

| Morgan's Allegations | Prior Publicly Disclosed Allegations |
|---|---|
| ***General allegations not specific to Medi-Span*:** | |
| AWPs, including those in First DataBank's Bluebook, are inflated. (*E.g.*, 3d Amend. Compl. ¶¶ 9, 17, 22, 25, 92, 95, 102.) | **Bill Brubaker, *Firms in Talks on Overbilling For Medicare, Medicaid Drugs*, WASH. POST, May 11, 2000,[1] at E03; Exhibit 2[2]:** "At issue is the formula used to calculate what the federal and state health insurance programs pay for drugs. The key component is known as AWP, which stands for average wholesale price. Some government officials say AWP actually stands for 'ain't what's paid,' because they assert it is neither average nor wholesale."<br><br>**Alice Dembner, *Medicare Waste Raises Cost of Drugs by $1B Congress to Hear Report on Overpayment Excess*, BOSTON GLOBE, Sept. 21, 2001, at A2; Exhibit 4:** "[F]ederal payments for Medicare and some Medicaid programs are based on a 'sticker' price that drug companies report for each drug, called the average wholesale price, or AWP. But in the industry, many joke that AWP stands for 'Ain't what's paid.' . . . Investigators for the House Energy and Commerce Committee and federal prosecutors allege that some companies inflated their list prices to create a bigger profit for doctors and pharmacists."<br><br>**Compl. ¶69-70, *AWP Litigation* (Dec. 19, 2001); Exhibit 3:** Alleging the defendant drug manufacturers "have grossly inflated the true average wholesale price for Medicare Covered Drugs" and "the published AWPs . . . bear little or no resemblance to actual wholesale prices available to the health care providers who bill for these drugs."<br><br>**Compl. ¶95-96, *AWP Litigation* (Dec. 19, 2001); Exhibit 3:** "Defendants grossly inflated the average wholesale price"; "defendants intentionally posted [artificially inflated prices] in pharmaceutical industry publications."<br><br>**Steve Bailey, *Profits vs. People*, BOSTON GLOBE, Apr. 10, 2002, at C1; Exhibit 6:** "In the industry, average wholesale price, or AWP, is an open joke that |

[1] The public disclosures listed in each section are ordered chronologically.

[2] The documents containing the listed public disclosures are attached to Medi-Span's Appendix and designated by their respective exhibit numbers.

| Morgan's Allegations | Prior Publicly Disclosed Allegations |
|---|---|
| | stands for 'Ain't What's Paid.' The General Accounting Office said that in 2000, pharmacies were reimbursed at least $483 million above their costs."<br><br>**Terry Carter, *Drug Wars: Coalition Tactics Make Price Fight Look Like Battle Over Tobacco*, 88 A.B.A. J. 41, 44-45 (Dec. 2002); Exhibit 5:** Describing AWP litigation and investigations dating back to 1995.<br><br>**OIG, Variation in State Medicaid Drug Prices, at iv, 2 (Sept. 2004); Exhibit 7:** "State price variation results from several factors, but fundamentally stems from States' lack of access to pharmacies' true acquisition costs. States rely on various proxies to estimate pharmacy acquisition cost, but these proxies are not necessarily related to pharmacies' actual costs. . . . Estimating pharmacy acquisition cost can present a challenge for States. Most often, States rely on published prices, including average wholesale price (AWP) and wholesaler acquisition cost, because they may not have access to the actual prices at which pharmacies purchase drugs. States generally obtain these list prices from a national pricing compendium issued by First Databank, a private company. However, numerous studies and audits by the Office of Inspector General (OIG) and other experts have found that these list prices, particularly AWP, overstate the prices pharmacies pay."<br><br>**PAL, *Settlement of Conspiracy Case Forces Major Restructuring of Prescription Drug Pricing System*, Oct. 6, 2006; Exhibit 8:** "A common joke in the field is that AWP stands for 'Ain't What's Paid.' Certain aspects of the AWP system make ripe for abuse and the type of fraud allegedly perpetuated by First Databank and McKesson [in the *NEC* case]. There is a need for greater oversight and monitoring of AWP and of the drug reimbursement system generally."<br><br>***Managed Care Pharmacists to Review Payment Methods*, 9 Inside CMS 22 (Nov. 2, 2006); Exhibit 9:** "The First Databank settlement [in the *NEC* case] comes after a seemingly endless string of investigations into manufacturers suspected of illegally inflating AWPs." |

| Morgan's Allegations | Prior Publicly Disclosed Allegations |
|---|---|
| | ***Class-Action Suit Against Drug Giants May Accelerate AWP Demise*, 9 Inside CMS 23 (Nov. 16, 2006); Exhibit 10:** Explaining the *AWP Litigation* "alleged that several dozen large drug manufacturers fraudulently overstated their drugs' AWPs, overcharging beneficiaries, Medicare and Medicaid." |
| There is a "spread" or markup between the AWP and the WAC; there is a spread between the cost at which pharmacies, doctors, other drug administrators, or PBMs purchase drugs and the cost at which they are reimbursed by third-party payors. (*E.g.*, 3d Amend. Compl. ¶¶ 89, 97, 101, 102, 108.) | **Michael Makoid & Robert Garis, *Inside the Cost of Prescription Drugs*, Creighton University Magazine, Fall 2001, at 22; Exhibit 11:** "The spread is the difference between what the prescription card company pays the pharmacist and what they bill the insurance company. For brand-name drugs, the prescription card company may pay the pharmacist 13 percent off the drug's average wholesale price and bill your insurance plan 10 percent off average wholesale price."<br><br>**Compl. ¶96, *AWP Litigation* (Dec. 19, 2001); Exhibit 3:** "The higher the AWP and the lower the actual cost, the greater the 'spread' and therefore, the greater the incentive to prescribe defendants' Covered Drugs."<br><br>**OIG, Medicaid Pharmacy—Additional Analyses of the Actual Acquisition Cost of Prescription Drug Products, at 1, 9 (Sept. 2002); Exhibit 12:** Identifying Medi-Span as a publisher of AWPs, and concluding that "[t]he results of our additional analyses included in this report provide further support for the recommendation contained in our earlier reports that [the Centers for Medicare & Medicaid Services] require the states to bring pharmacy drug reimbursement more in line with the actual acquisition cost of brand name and generic drugs. Our estimate of the discount below AWP for single source innovator [non-generic] drugs, 17.2 percent, was significantly greater than the discount used by most states for reimbursing drugs . . . (an average discount of 10.3 percent)."<br><br>**Robert I. Garis, et al., *Examining the value of pharmacy benefit management companies*, 61 Am. J. Health-Sys. Pharmacy 81, 83 (Jan. 1, 2004); Exhibit 13:** "Spread pricing is a revenue source PBMs have used in recent years. In spread pricing, the PBM negotiates lower rates with the pharmacy network but does not pass on these lower rates to the employer." |

| Morgan's Allegations | Prior Publicly Disclosed Allegations |
|---|---|
| | **Robert I. Garis & Bartholomew E. Clark, *The Spread: Pilot Study of an Undocumented Source of Pharmacy Benefit Manager Revenue*, 44 J. Am. Pharmacists Assoc. 1, 16 (January/February 2004); Exhibit 14:** "People in the managed care industry are commonly aware of a difference between what employers are charged for drug ingredient costs and what PBMs pay dispensing pharmacies for the same drug ingredients, but the magnitude of this difference has not been measured objectively. This difference is termed the 'spread' or sometimes the average wholesale price (AWP) spread. We define spread as 'the difference between the drug ingredient cost billed to the employer by the PBM and the drug ingredient cost the PBM pays to the dispensing pharmacy for that line item.'"<br><br>**2d Amend. Compl. ¶138, *AWP Litigation* (Feb. 24, 2005); Exhibit 15:** "[T]he AWPs for the drugs at issue here bore little relationship to the drugs' pricing in the marketplace. They were simply fabricated and overstated in furtherance of Defendants' scheme to generate the profit spread to providers, PBMs and others and to increase Defendants' profits at the expense of Plaintiffs and the Class members."<br><br>**2d Amend. Compl. ¶369, *AWP Litigation* (Feb. 24, 2005); Exhibit 15:** Discussing a Fujisawa internal memorandum stating that "[t]he standard wholesaler mark-up used by those databases is currently at 25% above direct list price which is our hospital list."<br><br>**Compl. ¶2, *NEC* (June 2, 2005); Exhibit 16:** "Although retailers ***buy*** pharmaceuticals on the basis of WAC, they ***get paid*** (*i.e.*, get reimbursed) for branded drugs based on a different benchmark, the average wholesale price or 'AWP.' As the difference between AWP and WAC increases, the larger 'spread' affords retailers and other middlemen like . . . PBMs the opportunities for larger profits."<br><br>**Barbara Martinez, *Health-Care Goldmines: Middlemen Strike It Rich*, WALL ST. J., Oct. 6, 2006, at A1; Exhibit 17:** "The trigger for [the *NEC*] litigation was a sudden rise in First DataBank's AWPs in 2002. Previously, the 20% markup |

| Morgan's Allegations | Prior Publicly Disclosed Allegations |
|---|---|
| | beyond the wholesaler's acquisition cost was common, although not universal. Suddenly, First Databank started revising its AWPs so that the markup was almost always 25%."<br><br>**Pharma Marketletter, *First Databank agrees to settle price fixing suit*, Oct. 10, 2006; Exhibit 18:** Discussing the First DataBank settlement in the *NEC* case, and stating that "it was claimed [in that lawsuit] that the publisher raised from 20% to 25% the mark-ups that wholesalers were making on their drug sales." |
| ***Medi-Span specific allegations:*** | |
| "First DataBank (and, for a time, **Medi-Span**, a subsidiary it later divested), at the urging of wholesaler McKesson, intentionally inflated Blue Book's published AWP over Red Book's numbers, creating an increasingly uniform 'spread' between the two." (3d Amend. Compl. ¶9.) | **Compl. ¶¶8-9, *NEC* (June 2, 2005); Exhibit 16:** "In approximately late 2001 or early 2002, unknown to payors in the pharmaceutical marketplace, First Data and McKesson reached agreement on how the WAC to AWP markup would be established for hundreds of brand-name drugs. As part of this agreement, First Data, to the extent it relied on information other than that provided directly from various drug manufacturers for specific drugs, used the WAC-to-AWP markup provided only by McKesson as the basis for its published AWP and did not 'survey' any other wholesalers. And at the same time, McKesson, without any economic justification, raised the WAC-to-AWP spread to 25%."<br><br>**PAL, *Settlement of Conspiracy Case Forces Major Restructuring of Prescription Drug Pricing System*, Oct. 6, 2006; Exhibit 8:** "The plaintiffs [in *NEC*] alleged that First Databank and McKesson illegally used the increased markups as a symbiotic business strategy for their respective drug-wholesaling and drug price publication production. The case claimed that McKesson and First Databank agreed to increase the 'spread' between AWP and WAC from 20% to 25% on hundreds of drugs, to benefit McKesson's customers and the purchasers of First Databank's pricing guides."<br><br>***Drug Price Publisher Will Stop Practice in Settlement*, ST. LOUIS POST-DISPATCH, Oct. 7, 2006, at A33; Exhibit 19:** "First DataBank . . . produces a list of the average wholesale price of numerous drugs, and the [*NEC*] suit alleged it |

| Morgan's Allegations | Prior Publicly Disclosed Allegations |
|---|---|
| | conspired with drug wholesaler McKesson Corp. to manipulate the price of medicines to benefit that company's customers."<br><br>**Theresa Agovino, *Publisher agrees to stop printing list of drug prices; Plaintiffs believed firm helped push costs up*, THE COMMERCIAL APPEAL, Oct. 8, 2006; Exhibit 20:** Explaining that the *NEC* case "claimed that McKesson and First DataBank increased the spread from 20 percent to 25 percent on hundreds of drugs."<br><br>**Joanne Wojcik, *Drug pricing system nixed by pact*, BUSINESS INSURANCE, Oct. 16, 2006, at 1; Exhibit 21:** Identifying Medi-Span as a publisher of AWPs not named in the *NEC* litigation, and stating that plaintiffs in *NEC* "alleged that First DataBank . . . conspired with . . . drug wholesaler McKesson Corp. to arbitrarily increase AWP markups to 25% from 20% between 2002 and 2005, resulting in overpayment to PBMs and pharmacies of as much as $4 billion."<br><br>***Managed Care Pharmacists to Review Payment Methods*, 9 Inside CMS 22 (Nov. 2, 2006); Exhibit 9:** "'Lots of people in the managed care industry were shocked about what was revealed in the [*NEC*] settlement,' an AMCP source says, referring to allegations that First Databank conspired with McKesson Corp., a wholesaler, to maximize profits and decrease pharmacy revenues by arbitrarily inflating the price 'spread' between AWP and the wholesale acquisition cost, a rate wholesalers often use when selling drugs to pharmacies."<br><br>***Class-Action Suit Against Drug Giants May Accelerate AWP Demise*, 9 Inside CMS 23 (Nov. 16, 2006); Exhibit 10:** Asserting that the plaintiffs in the *NEC* litigation "accused First Databank of conspiring with McKesson Corp., a wholesaler, to maximize profits by arbitrarily inflating the price 'spread' between AWP and the wholesale acquisition cost, a rate wholesalers often use when selling drugs to pharmacies." |
| "First DataBank repeatedly and consistently misrepresented in its public statements that its | **Compl. ¶¶90-91, *NEC* (June 2, 2005); Exhibit 16:** Describing First DataBank's divestiture of Medi-Span following the FTC's investigation, and explaining that |

| Morgan's Allegations | Prior Publicly Disclosed Allegations |
| --- | --- |
| Blue Book AWPs were trustworthy, thereby encouraging government agencies to rely on the Blue Book for calculating drug reimbursements. In addition, First DataBank populated **Medi-Span's MDDB** with the same artificially-inflated AWPs." (3d Amend. Compl. ¶235.) | "by this time, First Data's merger of the NDDF and [MDDB], along with changes of personnel and related systems effectuated over the prior three years, was nearly complete. As a result, as part of First Data's divestiture of the MediSpan assets, First Data was required to provide [WK Health] with transitional and editorial services for many years into the future. As a practical matter, therefore, pricing data contained in both the [Blue Book] and the [MDDB] post-divestiture remained the same."<br><br>**1st Amend. Compl. ¶92, *NEC* (July 17, 2006); Exhibit 22: "**The Consent Decree that implemented the divestiture of Medispan from FDB required that FDB continue to provide MediSpan with all the FDB pricing information until Medispan (now called Facts and Comparisons), was able to develop its own pricing production system. Thus, during the Class Period [August 2001 to March 2005], when the Scheme [to inflate the WAC/AWP spread] effectuated an increase in the FDB published spread, this increase also occurred in the Medispan published prices."<br><br>**1st Amend. Compl. ¶118, *NEC* (July 17, 2006); Exhibit 22:** "McKesson was aware that First Data had a virtual lock on the determination of AWPs because it was one of the only two electronic sources for pricing information, and although it was 'not widely known,' First Data had 'a contract with the Medispan group [the only other electronic pricing source] requiring that FDB supply the data over the next 3 or 4 years [i.e. through 2005 or 2006]. This means that essentially the Medispan data is the First DataBank data."<br><br>**Barbara Martinez, *Health-Care Goldmines: Middlemen Strike It Rich*, WALL ST. J., Oct. 6, 2006, at A1; Exhibit 17:** Discussing the First DataBank settlement in the *NEC* litigation: "First Databank had long said its prices reflected a survey of national wholesalers. But a manager at the publisher said in a deposition that from 2003 only one company, McKesson, participated in the survey. One of the most important parts of the proposed settlements in the U.S. District Court involves the benchmark price at issue in the litigation, known as average wholesale price or AWP. The term is a misnomer because it no longer represents a price paid to |

| Morgan's Allegations | Prior Publicly Disclosed Allegations |
|---|---|
| | wholesalers and is not an average of anything. An old industry joke holds that AWP stands for 'ain't what's paid.'"<br><br>**Transcript of Settlement Hearing at 19-20, *NEC* (Oct. 24, 2006); Exhibit 23:** "Medispan, because it was getting its information from First Databank, was using the same markups that First Databank was using; and to some extent, those markups still exist in the Medispan database." |
| "**Medi-Span** engaged in fraud and deceit, and made material false representations, by reporting artificially inflated AWPs while publicly stating that it provided accurate and current pricing information." (3d Amend. Compl. ¶240.) | **1st Amend. Compl. ¶5, *AWP Litigation* (Mar. 18, 2002); Exhibit 24:** Asserting that the fraudulent scheme to increase AWP was implemented by "creating artificial and grossly inflated AWP prices for publication in . . . Medi-Span."<br><br>**2d Amend. Compl. ¶626, *AWP Litigation* (Feb. 24, 2005); Exhibit 15:** "At all relevant times, each one of the Publishers [which includes Medi-Span] was aware of the Defendants Drug Manufacturers' AWP Scheme, was a knowing and willing participant in that scheme, and reaped profits from the scheme. Each of the publishing manufacturers is aware that the published AWPs are inflated."<br><br>**2d Amend. Compl. ¶627, *AWP Litigation* (Feb. 24, 2005); Exhibit 15:** Stating that there was evidence of "the publishers [including Medi-Span's] willing participation in the enterprise [with drug manufacturers]; their common purpose in the AWP scheme; and their agreement to a structure wherein the manufacturers made decisions as to what AWPs would be reported." |

| Morgan's Allegations | Prior Publicly Disclosed Allegations |
|---|---|
| "As a result of this scheme that artificially increased the Blue Book and **MDDB**'s reporting of AWPs, the federal and state governments and consumers have been forced to pay substantially higher prices for their prescription drugs than what purchasers in the prevailing market actually pay." (3d Amend. Compl. ¶241.) | **Compl. ¶72, *AWP Litigation* (Dec. 19, 2001); Exhibit 3:** "As a direct and proximate result of defendants' pattern of artificially and fraudulently inflating the AWP for Covered Drugs above the average wholesale price actually reflective of the relevant market, Plaintiffs and members of the Class substantially overpaid, in whole or in part, for the drugs and biologicals covered under Medicare."<br><br>**2d Amend. Compl. ¶¶624, 628, *AWP Litigation* (Feb. 24, 2005); Exhibit 15:** Medi-Span has been associated with drug manufacturers "for the common or shared purpose of (a) publishing or otherwise disseminating pharmaceutical price information, which all too often includes disseminating false and misleading AWPs, (b) selling, purchasing, and administering [AWP Inflated Drugs] to Plaintiffs and Class members, and (c) deriving profits from these activities. Each of the enterprises had a common purpose of perpetuating use of AWPs as a benchmark for reimbursement in the pharmaceutical industry, generally, and specifically for the drugs of that defendant. . . . The publishers agree to this scheme, because if they did not, the manufacturers could easily revert to the other methods of publishing prices or the publishers would have to independently investigate the AWP at significant expense. The publishers also have an economic incentive to merely report the AWPs provided to them by the manufacturers, because to do otherwise would require the Publishers to spend money to extensively survey actual sales prices in the market."<br><br>**Barbara Martinez, *Health-Care Goldmines: Middlemen Strike It Rich*, WALL ST. J., Oct. 6, 2006, at A1; Exhibit 17:** As a result of the 20 to 25% markup in AWP, "employers and others paid an extra $7 billion between August 2001 and March 2005 on drugs covered by the [*NEC*] suit." |

| Morgan's Allegations | Prior Publicly Disclosed Allegations |
|---|---|
| Any purported allegation that Medi-Span participated in a conspiracy to inflate the AWP, and thereby "get false or fraudulent claims paid by the United States." (*See* 3d Amend. Compl. ¶252[3].) | **2d Amend. Compl. ¶¶ 2, 135, *AWP Litigation* (Feb. 24, 2005); Exhibit 15:** "For the last decade, the Defendant Drug Manufacturers have conspired with others in the pharmaceutical distribution chain, including . . . various publishing entities [which includes Medi-Span], to collect inflated prescription drug payments from Plaintiffs and the Class."<br><br>**2d Amend. Compl. ¶¶ 12, 135, *AWP Litigation* (Feb. 24, 2005); Exhibit 15:** "[P]laintiffs claim that the Defendant Drug Manufacturers engaged in an illegal pattern of racketeering wherein each manufacturer formed a separate association-in-fact enterprise with each of the companies that published their inflated AWPs [which includes Medi-Span], and that each manufacturer conducted the affairs of each such enterprise." |

[3] Medi-Span maintains that any allegations it participated in a conspiracy do not meet the pleading requirements of Federal Rules of Civil Procedure 12(b)(6) and 9(b), by, among other things, lumping all defendants together. *See* Medi-Span's Memorandum in Support of Motion to Dismiss at 9 n.10, 25-26. Nevertheless, even if Morgan sufficiently pled that Medi-Span engaged in a conspiracy to inflate AWP, which he has not, those allegations would have been preceded by qualifying public disclosures.