# EXHIBIT 8



## PRESS

**Press Releases**

**Press Coverage**

**Media Inquiries**

Get updates on drug lawsuits, settlements and PAL news

Your Email here   Go!



Press Releases

10/06/2006

### PAL Announces Major Settlement with First Databank

**FOR IMMEDIATE RELEASE**
Friday October 6, 2006

**CONTACT:**
Mark Snyder
PAL
617.275.2931

**SETTLEMENT OF CONSPIRACY CASE FORCES MAJOR RESTRUCTURING OF PRESCRIPTION DRUG PRICING SYSTEM**

**Up to $4 Billion in Rx Drug Savings Expected**

**Boston, MA,** October 6 — The Prescription Access Litigation Project (PAL) today announced a groundbreaking settlement in a nationwide class-action lawsuit brought by PAL members New England Carpenters Health Benefits Fund and AFSCME District Council 37 Health and Security Plan against First Databank, Inc., the most widely-used publisher of prescription drug prices in the United States. The milestone settlement is forecasted to result in a 4 percent rollback of prices on hundreds of drugs which represent 95 percent of the nation's retail branded drug sales. The net impact will be a staggering $4 billion in savings for health plans which have been overcharged for prescription drugs.

"This settlement is truly remarkable and represents real progress in holding drug industry players accountable for the countless ways they manipulate the system in order to wring out unjust profits," said Alex Sugerman-Brozan, Director of PAL.

The case alleged that from 2002 to 2005, First Databank conspired with leading prescription drug wholesale provider, McKesson Corp., to arbitrarily increase by 5 percent the markups between what pharmacies pay wholesalers for prescription drugs and what health plans and insurers reimburse pharmacies for those prescription drugs. Pharmacies typically purchase drugs from wholesalers, at a price based on an industry price benchmark called the **"Wholesale Acquisition Cost"** (WAC). When pharmacies dispense drugs to consumers, insurance companies and health plans typically pay the pharmacy a price for the prescription that is based on another benchmark called **"Average Wholesale Price,"** or AWP. The difference between what the pharmacy pays the wholesaler and what the health plan pays the pharmacy is called the "spread," and it is the pharmacy"s profit on that prescription.

AWP is a controversial and outdated system, which has created billions of dollars in unnecessary drug spending every year as reimbursement prices for drugs have far exceeded the market price of drugs. AWPs are not based on actual sales, making them susceptible to being manipulated. The plaintiffs alleged that First Databank and McKesson illegally used the increased markups as a symbiotic business strategy for their respective drug-wholesaling and drug price publication production. The case claimed that McKesson and First Databank agreed to increase the "spread" between AWP and WAC from 20% to 25% on hundreds of drugs, to benefit McKesson's customers and the purchasers of First Databank"s pricing guides. McKesson was not part of today's settlement and remains a defendant in the case.

Under the settlement, First Databank has agreed to "rollback" the spread from 25% down to 20% on hundreds of the most-commonly prescribed drugs. This rollback will reduce what health plans pay pharmacies for the drugs that represent 95% of the retail branded drug market. This is projected to result in savings of approximately $4 billion at a time when drug costs are consuming an ever-greater portion of the nation"s health care dollar. However, the most important outcome of today's settlement is First Databank's agreement to cease publishing AWP data within two years of the Court's approval of the settlement. First Databank is a primary source of AWP data used by

insurers, employers, pharmacies and Pharmacy Benefit Managers (PBMs). First Databank's ceasing the publishing of AWP data is thus likely to be the end of the AWP system. This is likely to result in a shift to the use of a more transparent and accurate way of paying for drugs, which will have ripple effects throughout the health care system.

"AWP is on the ropes. We are hopeful that this settlement will knock it out once and for all and help usher in a new era of transparency in drug-pricing," PAL's Sugerman-Brozan emphasized. "The system that replaces AWP can only be an improvement."

The settlement reached today most directly benefits third-party payers, including health insurance plans, union benefit funds and self-insured employers who pay pharmacies for prescription drugs dispensed to their members, but have been forced to pay artificially inflated prices. Mark Erlich, Chair of the New England Carpenters Health Benefits Fund, commented, "We got involved in this case to make real change for working people, and that's what we've achieved today. Our Fund works hard to provide affordable benefits for our union members and their families, but our hands are tied when this kind of price-fixing is going on."

Rosaria R. Esperon, Administrator of AFSCME District Council 37 Health and Security Plan, asserts that the proposed settlement will allow her Plan to continue to provide affordable prescription drug benefits for hard working members and their families. "In the face of double digit annual increases, this lawsuit exposed the systematic upward manipulation of the prices of brand name drugs -- a practice that bled real dollars from our plan and, ultimately, from our members' pockets."

AFSCME District Council 37 Health and Security Plan and the New England Carpenters Health Benefits Fund are represented in the case by Hagens Berman Sobol Shapiro, one of the most experienced law firms in the country in large-scale public-impact litigation. The settlement agreement filed today awaits approval by the U.S. District Court in Massachusetts, where the case is currently pending. The price rollback is expected to go into effect eight to nine months after final approval of the settlement, resulting in major savings beginning in late 2007.

For more information about the First Databank lawsuit and settlement, please visit the PAL website at http://www.prescriptionaccess.org/lawsuitssettlements/current_lawsuits?id=0006

# # #

**The Prescription Access Litigation Project (PAL)** (www.prescriptionaccess.org) is a project of Boston-based Community Catalyst. PAL is a nationwide coalition of over 120 state, local, and national senior, labor and consumer health advocacy groups in 35 states fighting to make prescription drugs affordable. The organizations in the PAL coalition have a combined membership of over 14 million people. PAL works to end illegal drug industry practices that increase the price of prescription drugs beyond the reach of the American consumer, using class action litigation and public education. Since 2001, PAL members have filed 26 sets of lawsuits targeting such practices.

**Community Catalyst** (www.communitycatalyst.org) is a Boston-based national advocacy organization that builds consumer and community participation in the shaping of our health system to ensure quality, affordable health care for all.

**The New England Carpenters Health Benefits Fund** (www.necarpenters.org) provides comprehensive health care coverage to some 8,700 families representing 22,000 lives. Member benefits include office visits, hospitalization and surgery, home health care, prescription drug coverage, mental health and substance abuse treatment, dental and vision care.

**AFSCME District Council 37 Health and Security Plan** (www.dc37.net) provides a wide array of health and welfare benefits, including a prescription drug benefit, for 120,000 represented municipal employees and retirees of the City of New York, various authorities and cultural institutions, plus their spouses and dependants for a total of 300,000+ lives.

**Hagens Berman Sobol Shapiro, LLP (HBSS)** (www.hbsslaw.com), is one of the premier law firms in the country in large-scale public-impact litigation. HBSS has earned a special reputation as a nationwide leader in complex prescription drug litigation. Through its representation of the members of the Prescription Access Litigation Project , HBSS lawyers have been appointed to a leadership position in many large-scale prescription drug cases over the last five years. HBSS currently serves as a lead counsel in *In re Pharmaceutical Industry Average Wholesale Price Litigation* as well as in major antitrust class actions involving the drugs TriCor, OxyContin, and Wellbutrin, and deceptive promotion cases involving the drugs Vioxx, Celebrex, and Nexium. HBSS also served as a lead counsel in *In re Lupron Sales and Marketing Practices* in which it obtained $150 million class settlement; *In re Relafen Antitrust Litigation,* in which it secured a $75 million settlement for consumers and third-party payors; and many other significant prescription drug class actions. With offices in Boston, Chicago, Los Angeles, Phoenix, and Seattle, HBSS is also one of the largest plaintiffs' class action and multi-party litigation firms in the nation.

**Frequently Asked Questions about Average Wholesale Price (AWP)**

*Q: What is AWP?*

*A:* AWP is a "benchmark" used to determine how much pharmacies and health plans pay for prescription drugs. AWPs are determined primarily by drug manufacturers self-reporting them to publishers such as First Databank. First Databank lists these AWPs in publications used by pharmacies, health plans and others in paying for drugs.

Usually, pharmacies buy drugs from a wholesaler and then sell them to consumers. Since most consumers pay only part of a prescription via a fixed co-payment, the bulk of the cost of a prescription is paid by an insurance company (such as an HMO) or a government program (such as Medicaid or Medicare Part D). This payment to the pharmacy is called a "reimbursement." Nearly every insurance company that pays for drugs uses the AWP as the basis for reimbursement. For example, a health plan's contract with a pharmacy chain might specify that it will pay the pharmacy the AWP minus 8% for each prescription, plus a fixed dispensing fee. However, pharmacies typically purchase drugs based on another benchmark, the Wholesale Acquisition Cost (WAC). The difference between what the pharmacy paid (based on WAC) and what insurers reimburse the pharmacy (based on AWP), is known as the "spread." The larger that difference, the larger the pharmacy's profit. This lawsuit uncovered an alleged scheme to manipulate that spread.

A common joke in the field is that AWP stands for "Ain't What's Paid." Certain aspects of the AWP system make ripe for abuse and the type of fraud allegedly perpetuated by First Databank and McKesson. There is a need for greater oversight and monitoring of AWP and of the drug reimbursement system generally.

**Q: Who profits from inflated AWPs?**

*A:* Pharmacies profit from the difference between what they pay to the wholesaler and what they are paid by the insurance company or government as reimbursement. Effectively, the wider the gap between AWP and what the pharmacy actually paid for the medication, the larger their profit. In another class action lawsuit, *In re Pharmaceutical Industry Average Wholesale Price Litigation,* as well as lawsuits brought by more than 20 state Attorneys General, dozens of drug companies are alleged to have manipulated this "spread" in order to increase sales of their drugs. First Databank, as the largest and essentially only publisher of AWP data, enables this broken system to continue and thrive. Today's settlement helps put an end to that.

**Q: How did First Databank and McKesson benefit from this alleged scheme?**

*A:* The lawsuit alleges that McKesson and First Databank conspired to artificially increase the markup between AWP and Wholesale Acquisition Cost (WAC) on hundreds of drugs, which would increase the "spread." The case alleges that this benefited McKesson because it benefited McKesson's customers (pharmacies and large institutional buyers), who would thus be more likely to purchase their drugs from McKesson than from a competing wholesaler. The case alleges that the scheme benefited First Databank because it encouraged pharmacies and others to purchase and use First Databank's publications, which listed higher AWPs, than publications of First Databank's competitors.

**Q: Who is affected by AWP?**

*A:* Private health plans (including Medicare Part D plans), which provide prescription drug coverage for a majority of Americans, still overwhelmingly use AWP to pay pharmacies for the prescriptions their members fill. The manipulation of AWP increases their drug costs by billions of dollars every year. This, in turn, hurts consumers, as health plans pass on these expenses to their members, in the form of higher premiums and higher copayments. Higher premiums make it harder for employers to offer health insurance, and for lower income workers to pay for health insurance even when it is offered. This in turn increases the number of uninsured people and the burden on public health programs such as Medicaid. AWP inflation thus has a ripple effect throughout the entire health care system.

**Q: Will consumers be eligible to receive money from this settlement?**

*A:* No. This settlement achieves a massive rollback in drug prices. It does not involve a payment by First Databank of money damages. Although consumers and health plans will not receive cash as part of this settlement, they will get the benefits of $4 billion in savings from the rollback, and the enormous long-term savings that will come from First Databank's ending the publishing of AWPs.

**Q: Has anyone discontinued the use of AWP?**

*A: A*ter a number of government reports over several years documented massive overcharging of government health programs due to AWP inflation, both Medicare Part B (which pays for drugs administered in a doctor's office) and Medicaid are phasing out the use of AWP and adopting other, more transparent benchmarks to decide how much to pay for drugs. Several states, such as Txas, try to force drug companies to verify the accuracy of their published AWPs. .

**Q: Are PAL members involved in other cases concerning AWP?**

*A:* This agreement falls on the heels of a $70 million settlement by drug maker GlaxoSmithKline (GSK) over claims in the *In re Pharmaceutical Industry Average Wholesale Price* litigation brought by PAL members and others. That case alleged that GSK had defrauded cancer patients by illegally

inflating the AWP for two cancer drugs to increase their own sales. That case continues against dozens of other major drug companies.

**Q: What is the future of AWP?**

**A:** First Databank, the main publisher of AWP data, has agreed to go out of the business of publishing AWPs, as long as its competitors do likewise. Following the settlement, private health plans are likely to shift over time to more accurate and transparent benchmarks as AWP data becomes unavailable. They may shift to using Wholesale Acquisition Cost (WAC), which is based on what wholesalers pay drug manufacturers, or to Average Manufacturers' Price (AMP), which Medicaid is slated to begin using in 2007.

**Q: Will eliminating AWP mean the end of the manipulation of drug prices?**

**A:** No. Unscrupulous industry players will always try to manipulate whatever system is in place. The other available benchmarks are more transparent, and thus less susceptible to manipulation. Although no system is fraud-proof, the greater the transparency and accuracy, the harder it will be to manipulate prices. The end of AWP should mean a massive reduction in the manipulation of drug prices through illegal tactics. However, aggressive monitoring and oversight by state and federal governments is necessary to ensure that drug industry players do not engage in this kind of fraud.