# EXHIBIT 21



1 of 1 DOCUMENT

Copyright 2006 Crain Communications
All Rights Reserved
Business Insurance

October 16, 2006

**SECTION:** NEWS; Pg. 1

**LENGTH:** 1321 words

**HEADLINE: Drug pricing system nixed by pact;**
Class settlement may lead to reduced prescription costs

**BYLINE:** JOANNE WOJCIK

**BODY:**

   A proposed settlement of a class action lawsuit against the nation's No. 1 provider of average wholesale prices for pharmaceuticals likely will result in pharmacy benefit managers attempting to renegotiate their contracts to preserve their profit margins, experts say.

   Employers, organizations and other PBM users should not pin their hopes on lowering their drug costs in the immediate future but, if the settlement is finalized, PBM users could see more competitive drug prices going forward. The case also could lead to the end of the AWP system, observers say.

   The settlement, which is pending approval by Judge Patti Saris in the U.S. District Court in Boston, would require First DataBank Inc. to reduce average wholesale prices by 5% and eventually cease publishing the drug price benchmark that insurers, employers, pharmacies and PBMs use to set prescription drug prices. This AWP often is the starting point in negotiations for employers seeking discounts from their PBMs.

   Filed by the New England Carpenters Health Benefits Fund and AFSCME District Council 37 Health and Security Plan, the lawsuit alleged that First DataBank, a San Bruno, Calif.-based division of publisher Hearst Corp., conspired with San Francisco-based drug wholesaler McKesson Corp. to arbitrarily increase AWP markups to 25% from 20% between 2002 and 2005, resulting in overpayment to PBMs and pharmacies of as much as $4 billion.

   The increase allegedly benefited both McKesson's customers and the purchasers of First DataBank's pricing guides, the suit claimed. Though First DataBank claimed its AWP reflected a survey of national drug wholesalers, it turned out only McKesson participated in the survey.

Drug pricing system nixed by pact; Class settlement may lead to reduced prescription costs Business Insurance October 16, 2006

While it has agreed to settle the case, First DataBank denies any wrongdoing and said that, while it does report and publish information collected from third parties, it does not set pharmaceutical prices.

McKesson, which remains a defendant in the litigation, issued a statement after the proposed settlement was announced asserting that ``the claims against McKesson have no merit and we will defend ourselves vigorously.''

Theoretically, reducing the markup on prescription drug prices by 5% should result in a 5% reduction in the cost to employers. However, the settlement, even if it is approved, is unlikely to result in a windfall for employers, experts say.

``In theory, it would mean lower costs if your deal stayed the same with your PBM,'' said Sean Brandle, a vp at The Segal Co. in New York. ``If employers did absolutely nothing and First DataBank started lowering the prices, they would save money. But I don't know how it's going to pan out. I assume the PBMs are going to try and renegotiate contracts.''

PBM contracts have provisions that ``if there is a substantial change in AWP methodology,'' the PBM will have the right to reopen negotiations that come to equitable terms to maintain the status of both parties, Mr. Brandle added.

David Dross, a principal and national practice leader for managed pharmacy at Mercer Health & Benefits in Houston, agreed. ``The bottom line is, I don't think a lot of the providers-both PBMs and retailers-are really interested in seeing their profit margins shrink,'' Mr. Dross said. ``So what that potentially implies is some sort of contract renegotiation between the PBMs, the retailers and ultimately, because the plan sponsor is the one paying for it, the plan sponsors.''

``That's all a long of way of saying this may not result in substantial cost savings to plan sponsors as a result of what the PBM and the retailers come back with based on this potential change,'' Mr. Dross said. ``The term that I heard repeatedly over the past few days is that they want to `maintain contract economics,' which is a politically correct way of saying in effect `maintain the same pricing levers,' and, for the PBM, whatever their previous profit margin was.''

In fact, during an analyst conference call last Tuesday, CVS Corp. President and Chief Executive Officer Tom Ryan asserted that if the AWP is adjusted significantly, CVS will renegotiate its PBM contracts ``to avoid any significant margin impact.''

PBMs contacted by Business Insurance either declined to comment or did not return calls with the exception of Medco Health Solutions Inc., which issued a statement saying that ``the settlement has not been approved by the court so at this point it's a theoretical exercise. That said, situations such as these are defined in our customer contracts and we will have these discussions directly with our clients.''

To avoid lower prices, some PBMs may attempt to switch from First DataBank, which provides AWP data to 75% to 80% of the U.S. drug distribution industry, to Medi-Span, a smaller publisher of AWP data that wasn't named in the suit, sources say. Indianapolis-based Medi-Span is a unit of Wolters Kluwer Health Inc.

Drug pricing system nixed by pact; Class settlement may lead to reduced prescription costs Business Insurance October 16, 2006

``In aggregate, (Medi-Span's listed prices) must be 1% to 2% lower across a broad spectrum of drugs,'' according to Mercer's Mr. Dross.

A spokesman for Medi-Span said the company's lawyers are reviewing the proposed settlement to determine whether it would have any impact on its operations, but declined to say whether it would alter or discontinue use of its AWP.

Even if there is no immediate savings for employers, the eventual discontinued use of the AWP could lead to more competitive prescription drug pricing in the future, particularly if a new pricing model emerges that is based on the wholesale acquisition cost plus a defined profit margin, sources say.

Even before the proposed settlement was reached, the pharmacy and payer community were already discussing whether to abandon the controversial AWP since it no longer represents the actual price paid. In fact, there is a joke in the industry that AWP really stands for ``Ain't What's Paid.''

Just days after the proposed settlement was announced, the Academy of Managed Care Pharmacy, a national association of pharmacists based in Alexandria, Va., issued a statement that said it has initiated an assessment of current payment methodologies for prescription drug products.

``For the past few years, people have been talking about moving away from AWP and coming up with a new standard for drug pricing,'' said John Malley, eastern region pharmacy practice leader at Watson Wyatt Worldwide in New York. ``Medicare uses average sales price, which is a different calculation of acquisition costs. People have been talking about the variability around AWP in the first place and that maybe it's not a good starting point. I wonder if this is going to put fuel in that fire.''

``There are already some shifts toward other benchmarks, particularly for government programs,'' said Alex Sugerman-Brozan, director for the Boston-based Prescription Access Litigation Project, whose members were the plaintiffs in the case.

``This settlement is going to add huge momentum to the private market switching to other benchmarks, too, which, frankly, they should have been doing for the past 10 years. Instead they've been trying to negotiate bigger and bigger discounts off of AWP. But the analogy we always draw is it's sort of like the store that raises its prices and then holds a sale,'' he said.

Christine Whipple, executive director of the Pittsburgh Business Group on Health, said that members of the coalition's pharmacy benefit users group have been discussing the use of AWP vs. wholesale acquisition costs and other available pricing metrics.

``What this does is continue to shine the light on this particular area of the pharmaceutical prescription drug benefit-allowing the employers to ask the critical questions and get the answers they need so that they can move forward on the benefit,'' Ms. Whipple said.

New England Carpenters Health Benefits Fund et al. vs. First DataBank Inc. and McKesson Corp., Civil Action No. 05-11148, Filed June 2, 2005, U.S. District Court for the District of Massachusetts in Boston.

Page 4
Drug pricing system nixed by pact; Class settlement may lead to reduced prescription costs Business Insurance October 16, 2006

**LOAD-DATE:** October 18, 2006