*U.S. ex rel Morgan v. Express Scripts, Inc., et al.* APPENDIX A
No. 05-CV-1714(DMC)(JAD)

## AmerisourceBergen Corporation Allegations
## Prior Public Disclosures Chart

| **Complaint Paragraph** | **Allegation** | **Prior Disclosure** |
|---|---|---|
| Third Amended Complaint ¶¶ 89, 237 (Jan. 26, 2009)<br><br>Second Amended Complaint ¶¶ 15, 17, 80(b), 93, 154 (Nov. 30, 2006) | ABC "provided First DataBank with false, inflated prices and/or fictitious markups over WAC instead of actual net prices or actual effective markups or markdowns to WAC at which they sold drugs to retailers." | First Am. Compl. at ¶ 9, *N.E. Carpenters Health Benefits Fund v. First DataBank, Inc.*, No. 05-11148 (July 21, 2006) ("*N.E. Carpenters*") (Ex. 9) (alleging that McKesson was the "source" of the increased markup and that McKesson "communicated these new WAC-to-AWP spreads" to First DataBank); ¶ 12 (alleging that McKesson "artificially raise[d] the WAC-to-AWP spread" and provided those "increased AWPs" to First DataBank); *id.* ¶ 129 (alleging that "McKesson reported the across the [board] WAC-to-AWP increase to First Data, and First Data in turn agreed to report the new AWPs").<br><br>Class Action Compl. at ¶ 68, *In re Pharm. Industry Avg. Wholesale Price Litig.*, MDL No. 1456 (D. Mass Dec. 19, 2001) ("AWP MDL") (Ex. 1) ("The wholesaler catalogs, listing wholesale prices, are according to the DOJ, a more accurate representation of the true wholesale cost than the prices published by the Defendant[] [manufacturers] in either the Red Book or Medispan."); *id.* ¶ 69 ("The wholesale catalog prices reveal that the Defendant[] [manufacturers] have grossly inflated the true average wholesale price for Medicare Covered Drugs."); *id.* ¶ 70 ("The published AWPs … bear little or no resemblance to actual wholesale prices available to the health care providers who bill for these drugs."); *id.* ¶ 71 (alleging that the defendant manufacturers "directly control the AWP listed in the industry publications"); *id.* ¶ 96 (alleging that defendant manufacturers "intentionally posted in pharmaceutical industry publications" "artificially inflated prices"). |

*U.S. ex rel Morgan v. Express Scripts, Inc., et al.*  APPENDIX A
No. 05-CV-1714(DMC)(JAD)

| **Complaint Paragraph** | **Allegation** | **Prior Disclosure** |
|---|---|---|
| | | First Am. Class Action Compl. at ¶¶ 80, 82, AWP MDL (Mar. 18, 2002) (Ex. 2) (alleging that "pharmaceutical manufacturers artificially and grossly inflate the true average wholesale prices" and that each defendant manufacturer "controls the published AWP for its products and has regularly and unjustifiably raised the AWP in order to capture and control market share and massively increase gross product sales"). <br><br> Compl. at ¶¶ 7, 9 *State v. Abbott Labs., Inc.*, No. CV02-00280 (Nev. Dist. Ct. Washoe Cnty. Jan. 17, 2002) (Ex. 27) (alleging that drug manufacturers "engaged in a scheme involving the fraudulent reporting of fictitious AWP for certain prescription pharmaceuticals" and that AWP "bears little or no relationship to the prices actually paid by physicians or pharmacies"). <br><br> 146 Cong. Rec. E2037-04 (daily ed. Oct. 31, 2000) (statement of Rep. Pete Stark) (remarking that the government had launched an investigation into whether a drug manufacturer had "intentionally reported inflated prices" and manipulated "the spread" to "cause its customers to receive windfall profits from Medicare and Medicaid when submitting claims for certain drugs"). <br><br> 149 Cong. Rec. E1415-02 (daily ed. Jul. 8, 2003) (statement of Rep. James C. Greenwood) ("Over the past decade, what we have learned is that AWP is a fictitious number that must be changed. . . . [T]he AWP benchmark is more like a car's "sticker price," which is usually much higher than the actual acquisition cost. Under competitive pressure, manufacturers and wholesalers will routinely discount drug prices to physicians, lower their cost, while maintaining a higher AWP. In a competitive spiral, these discounts grow, increasing the net profits on the drugs, while the Medicare program continues to pay the higher AWP."). |

*U.S. ex rel Morgan v. Express Scripts, Inc., et al.* APPENDIX A
No. 05-CV-1714(DMC)(JAD)

| **Complaint Paragraph** | **Allegation** | **Prior Disclosure** |
|---|---|---|
| | | DEP'T OF HEALTH & HUMAN SERVS., OFFICE OF INSPECTOR GENERAL, MEDICAID'S USE OF REVISED AVERAGE WHOLESALE PRICES, at ii (Sept. 2001) (Ex. 11) ("Over the last several years, the OIG has produced a significant body of work that clearly demonstrates the inflated nature of reported average wholesale prices."); at 3 ("A recent investigation conducted by the United States Department of Justice and the National Association of Medicaid Fraud Control Units (NAMFCU) revealed that some drug manufacturers were reporting inflated average wholesale prices for certain products."). <br><br> DEP'T OF HEALTH & HUMAN SERVS., OFFICE OF INSPECTOR GENERAL, VARIATION IN STATE MEDICAID DRUG PRICES, at 2 (Sept. 2004) (Ex. 10) (noting that states usually obtain AWP and WAC prices from First Databank, "[h]owever, numerous studies and audits by the [OIG] and other experts have found that these list prices, particularly AWP, overstate the prices pharmacies pay."); *id.* at 4 (A 2002 OIG report "found that AWP overstated acquisition costs of single source drugs by 17.2 percent," and over 70 percent for drugs with FULs). <br><br> Steve Bailey, *Profits v. People*, Boston Globe, Apr. 10, 2002, at C1 (Ex. 12) ("While Medicaid payments are based on average wholesale prices, doctors and pharmacies received big discounts and never paid those prices. . . . In the industry, average wholesale price, or AWP, is an open joke that stands for 'Ain't What's Paid.'"). <br><br> Alice Dembner, *Medicare Waste Raises Cost of Drugs by $1B*, Boston Globe, Sept. 21, 2001, at A1 (Ex. 13) ("Current federal payments for Medicare and some Medicaid programs are based on a 'sticker' price that drug companies report for each drug, |

3

| **Complaint Paragraph** | **Allegation** | **Prior Disclosure** |
|---|---|---|
| | | called the average wholesale price, or AWP. But in the industry, many joke that AWP stands for 'Ain't what's paid.'"). <br><br> Bill Brubaker, *Firms in Talks on Overbilling for Medicare, Medicaid Drugs*, Washington Post, May 11, 2000, at E3 (Ex. 14) ("Some government officials say AWP actually stands for 'ain't what's paid,' because they assert it is neither average nor wholesale."). <br><br> Deborah Caulfield Rybak, *Drugmaker Sued: Attorney General Mike Hatch Says Government Insurers are Being Charged Huge Markups on Drugs*, Star Tribune, June 19, 2002, at 1D (Ex. 41) ("[T]he AWP quoted to the government has nothing to do with the actual wholesale prices that non-governmental insurers pay the drugmakers for pharmaceuticals."). <br><br> *In re Pharm. Indus. Avg. Wholesale Price Litig.*, 252 F.R.D. 83, 97 (D. Mass. 2008) ("By 2001, there was a perfect storm of information that reflected the size of the [AWP] spreads, largely because of the compelling information collected by HHS Office of Inspector General ("OIG"). In addition, the press began to report on the rampant abuse of the AWP system."). <br><br> *House Committee Probes Medicaid Fraud*, Drugs.com (June 26, 2003) (Ex. 25) (reporting on letter from House of Representatives to ABC regarding an investigation of "significant discrepancies between what some pharmaceutical companies charged providers for certain drugs and what Medicare [and Medicaid] then reimbursed those providers for dispensing those drugs"). <br><br> DEP'T OF HEALTH & HUMAN SERVS., PROGRAM MEMORANDUM: AN ADDITIONAL SOURCE OF AVERAGE WHOLESALE PRICE DATA |

*U.S. ex rel Morgan v. Express Scripts, Inc., et al.* APPENDIX A
No. 05-CV-1714(DMC)(JAD)

| **Complaint Paragraph** | **Allegation** | **Prior Disclosure** |
|---|---|---|
| | | IN PRICING DRUGS AND BIOLOGICALS COVERED BY THE MEDICARE PROGRAM, PM REV. AB-00-86 (Sept. 8, 2000) (Ex. 26) ("[T]he DOJ has indicated that because purchasers often receive further discounts below the advertised wholesale catalog price, either from a wholesaler or from the drug manufacturer directly, actual acquisition costs may be lower."). |
| Third Amended Complaint ¶¶ 87, 90, 145 (Jan. 26, 2009)<br><br>Second Amended Complaint ¶¶ 79-80 (Nov. 30, 2006) | ABC "knew that First DataBank would use the fictitious pricing information to determine and publish false AWPs."<br><br>ABC was "aware that when the state and federal governments paid for prescription drugs they would be relying upon wholesalers . . . to accurately report to First DataBank the prices at which they were selling drugs to retailers." | First Am. Compl. at ¶ 117, *N.E. Carpenters* (July 21, 2006) (Ex. 9) ("McKesson also knew it would not be difficult to impose its suggested sell prices on First Data's published AWPs because First Data's 'wholesaler surveys' were not to be taken seriously and consisted of nothing more than a brief phone call or e-mail."); *id.* ¶ 125 (alleging that McKesson knew that "First Data gave up all pretense of conducting a survey for new products"); *id.* ¶ 129 ("McKesson reported the across the [board] WAC-to-AWP increase to First Data, and First Data in turn agreed to report the new AWPs."); *id.* ¶ 131 ("Eventually First Data . . . relied entirely on the information that McKesson provided it to determine AWPs. McKesson was aware that First Data routinely disregarded manufacturers' suggested sell prices.").<br><br>Compl. at ¶ 10, *State v. Pharmacia Corp.*, No. 02-9660 (Minn. Dist. Ct. Hennepin Cnty. June 18, 2002) (Ex. 29) ("Defendant was aware that the Medicaid program uses the Defendant's AWPs and other pricing information, as provided to various price reporting services, to determine the amounts it reimburses for prescription drugs. The Defendant knowingly and intentionally inflated the AWPs for its drugs.").<br><br>Compl. at ¶ 111, *State v. Abbott Labs.*, No. CV-05-219 (Ala. Cir. Ct. Mont. Cnty. Jan. 26, 2005) (Ex. 34) ("Defendants knowingly, willfully, wantonly, and/or intentionally provided or caused to be |

5

| Complaint Paragraph | Allegation | Prior Disclosure |
|---|---|---|
| | | provided false and inflated AWP, WAC, and/or Direct Price information for their drugs to various nationally known drug industry reporting services, including First DataBank (a/k/a Blue Book), Medical Economics, Inc. (a/k/a Red Book), and Medispan. These reporting services published the pricing information to various reimbursers, such as Alabama Medicaid, who have contracted to receive the information . . . as a basis to provide reimbursement."). <br><br> Compl. at ¶ 12, *City of New York v. Abbott Labs., Inc.*, MDL No. 1456 (D. Mass. June 22, 2005) (Ex. 37) ("Defendants provide grossly inflated wholesale pricing information to the publishing services, causing them in turn to publish similarly inflated AWPs in order to create a large spread between the actual price that providers, such as pharmacists, pay to acquire drugs and the reimbursement that those same entities receive from Medicaid, Medicare and private third party payors."). |
| Third Amended Complaint ¶ 91 (Jan. 26, 2009) <br><br> Second Amended Complaint ¶¶ 89, 95 (Nov. 30, 2006) | "McKesson and [ABC] knowingly caused false or fraudulent claims to be presented to state and federal governments for payment or approval." | Compl. at ¶ 174, *N.E. Carpenters* (June 2, 2005) (Ex. 4) ("McKesson proceeded to implement a false advertising scheme designed to induce [third party] payors to pay based on the inflated amount."). <br><br> Memo. in Support of Motion for Leave to File First Am. Compl. at 1-2, *N.E. Carpenters* (July 17, 2006) (Ex. 7) ("Because throughout the industry the AWP serves as the benchmark for third party payments to pharmacies, Defendants' artificial inflation of these figures caused Plaintiffs and the Class to lose hundreds of millions of dollars in the form of excess payments to pharmacies."). |

*U.S. ex rel Morgan v. Express Scripts, Inc., et al.*  APPENDIX A
No. 05-CV-1714(DMC)(JAD)

| **Complaint Paragraph** | **Allegation** | **Prior Disclosure** |
|---|---|---|
| | | First Am. Compl. at ¶ 62, *N.E. Carpenters* (July 21, 2006) (Ex. 9) (quoting a 2001 internal McKesson note that stated "I think it is important to understand the AWPs that are used for third party reimbursement are the First Data Bank ('FDB') AWPs"); *id.* ¶ 185 (alleging that "McKesson and First Data calculated and intentionally crafted the Scheme to ensure that plaintiffs and members of the Class would be over-billed for the drugs."). <br><br> Class Action Compl. at ¶ 1, AWP MDL (Dec. 19, 2001) (Ex. 1) (Defendants "overstat[ed] the average wholesale price (AWP) for Medicare Covered Drugs, the basis for the determination of the Medicare reimbursement rate" and "promot[ed] the sale of Medicare Covered Drugs through health care providers by selling the Covered Drugs to them at a price substantially less than the health care providers charged Medicare and Medicaid."). <br><br> Fourth Am. Master Consol. Class Action Compl. at ¶ 618(f), AWP MDL (Mar. 1, 2006) (Ex. 3) (Defendant manufacturers made "[w]ritten and oral communications with U.S. Government agencies and private insurers that fraudulently misrepresented what the AWPs were, or that were intended to deter investigations into the true nature of the AWPs or to forestall changes to reimbursement based on something other than AWPs"); *id.* ¶ 170 (quoting letter from Congressman Pete Stark which states: "Certain drug manufacturers engage in the fraudulent [AWP] price manipulation for the express purpose of causing federally funded health care programs to expend scarce tax dollars in order to arrange de facto kickbacks for the drug manufacturers' customers at a cost of billions of dollars."). <br><br> Compl. at ¶ 12, *State ex rel. McGrath v. Abbott Laboratories, Inc.*, No. DV-2002-4155 (Mont. Dist. Ct. Lewis and Clark Cnty. |

*U.S. ex rel Morgan v. Express Scripts, Inc., et al.* APPENDIX A
No. 05-CV-1714(DMC)(JAD)

| Complaint Paragraph | Allegation | Prior Disclosure |
|---|---|---|
| | | Feb. 25, 2002) (Ex. 28) ("As a result of the fraudulent and illegal manipulation of AWP for certain drugs by the Defendant pharmaceutical manufacturers, they and the other manufacturers have reaped tens of millions of dollars in illegal profits at the expense of American governmental payors and consumers."). <br><br> Compl. at ¶ 71, *State v. Abbott Labs., Inc.*, No. 06-1-0720-04 EEH (Haw. 1st Cir. Ct. Apr. 27, 2006) (Ex. 39) ("Defendant Drug Manufacturers have used the distribution chain, including but not limited to physicians, hospitals, pharmacists and others, to create and thereby profit from an unfair or deceptive scheme that improperly inflated the prescription drug payments made by the DHS and Hawaii's citizens."). |
| Third Amended Complaint ¶¶ 130, 146 (Jan. 26, 2009) <br><br> Second Amended Complaint ¶¶ 94, 109 (Nov. 30, 2006) | ABC changed from a 20% to 25% markup along with McKesson. | Compl. at ¶ 1, *N.E. Carpenters* (June 2, 2005) (Ex. 4) (alleging that First DataBank and McKesson "wrongfully increas[ed] the so-called WAC to AWP markup factor for numerous prescription pharmaceuticals through a scheme begun in late 2001 and 2002"); *id.* ¶ 9 ("McKesson, without any economic justification, raised the WAC-to-AWP spread to 25% for over four hundred brand-name drugs that previously had received only the 20% markup amount."); *id.* ¶ 10 ("This collaboration between First Data and McKesson to raise the WAC-to-AWP spreads is referred to as the 'Five Percent Spread Scheme.'"); *id.* ¶ 14 (again referencing scheme to increase AWP markup from 20% to 25%). <br><br> First Am. Compl., at ¶ 130, *N.E. Carpenters* (July 21, 2006) (Ex. 9) (Relying on an email entitled "AWP Discussion" which explains that 20% markups "had a negative impact on McKesson's customers' profitability" and that "McKesson has chosen to 'normalize' the markups in the Brand Rx area resulting in a consistent 25% markup or use of the 1.25 factor."); *id.* ¶ 132 |

8

*U.S. ex rel Morgan v. Express Scripts, Inc., et al.* APPENDIX A
No. 05-CV-1714(DMC)(JAD)

| **Complaint Paragraph** | **Allegation** | **Prior Disclosure** |
|---|---|---|
| | | ("By early 2002, however, McKesson estimated that through defendants' efforts 90% of the industry had turned to the 25% markup. By late 2002, McKesson estimated that the number had increased to 95%. In 2004, McKesson estimated that 99% of the prescription drugs were set at a 25% markup."); *id.* ¶ 146 (The change from 20% to 25% in AWP markup was "being driven at wholesaler level.").<br><br>Barbara Martinez, *A "Survey" of One Company*, Wall Street Journal, Oct. 6, 2006, at A1 (Ex. 15) ("Suddenly [in 2002] First DataBank started revising its AWPs so that the markup was almost always 25%. According to internal McKesson documents, by 2004 nearly 99% of drugs carried the larger 25% markup.").<br><br>*First DataBank Agrees to Settle Price Fixing Suit*, Pharma Marketletter (Marketletter Publ'ns, Ltd.), Oct. 16, 2006 (Ex. 16) (First DataBank "raised from 20% to 25% the mark-ups that wholesalers were making on their drug sales").<br><br>Theresa Agovino, *Publisher Agrees to Stop Printing List of Drug Prices*, Memphis Commercial Appeal, Oct. 8, 2006, at D4 (Ex. 17) ("McKesson and First DataBank increased the spread from 20 percent to 25 percent on hundreds of drugs.").<br><br>Press Release, Prescription Access Litigation Project, *Settlement of Conspiracy Case Forces Major Restructuring of Prescription Drug Pricing System* (Oct. 6, 2006) (Ex. 18) ("The case alleged that from 2002 to 2005, First Databank conspired with leading prescription drug wholesaler provider, McKesson Corp., to arbitrarily increase by 5 percent the markups between what pharmacies pay wholesalers for prescription drugs and what health plans and insurers reimburse pharmacies for those |

*U.S. ex rel Morgan v. Express Scripts, Inc., et al.* APPENDIX A
No. 05-CV-1714(DMC)(JAD)

| Complaint Paragraph | Allegation | Prior Disclosure |
|---|---|---|
| | | prescription drugs."). |
| Third Amended Complaint ¶ 137 (Jan. 26, 2009)<br><br>Second Amended Complaint ¶¶ 78-79 (Nov. 30, 2006) | ABC "inflated and/or conspired to inflate the reported AWP of certain drugs" with McKesson and Cardinal to create "consistent and uniform price increases." | First Am. Compl. at ¶ 28, *N.E. Carpenters* (July 21, 2006) (Ex. 9) ("This case involves the unlawful inflation of the 'markup' factor between the so-called wholesale acquisition cost (or 'WAC') and the so-called average wholesale price (or 'AWP') of a large number of prescription pharmaceutical products, a scheme implemented in late 2001 and 2002 by McKesson . . . and First Data."); *id.* ¶ 116-117, 130 (alleging that McKesson wanted to "normalize" the AWP spread on brand pharmaceuticals); *id.* ¶ 119 ("McKesson and First Data agreed to implement a fundamental change in the WAC-to-AWP markups for branded drugs of all of the major manufacturers."); *id.* ¶ 213 (alleging that McKesson and First DataBank "joined in a conspiracy to raise the spread between reported AWPs and WAC. Each defendant also agreed to publish or caused to be published AWPs that were inflated as a result.").<br><br>Compl. at ¶ 52, *Commonwealth ex rel. Stumbo v. Alpharma, Inc.*, No. 04-CI-1487 (Ky. Cir. Ct. Franklin Cnty. Nov. 4, 2004) (Ex. 33) ("All of the defendants have inflated their reported average wholesale prices to levels far beyond any real average wholesale price of their drugs and their subsidiaries' drugs. One high-ranking industry executive has described it as the industry practice to do so.").<br><br>Compl. at ¶ 2, *State v. Abbott Labs., Inc.*, No. 05CH02474 (Ill. Cir. Ct. Cook Cnty. Feb. 7, 2005) (Ex. 35) ("[D]efendants have taken advantage of the enormously complicated and non-transparent market for prescription drugs to engage in an unlawful scheme to cause the State of Illinois and its citizens to pay inflated prices for prescription drugs. The scheme involved the |

U.S. ex rel Morgan v. Express Scripts, Inc., et al.                                                          APPENDIX A
No. 05-CV-1714(DMC)(JAD)

| **Complaint Paragraph** | **Allegation** | **Prior Disclosure** |
|---|---|---|
| | | publication by defendants of phony 'average wholesale prices.'"). <br><br> JoAnne Wojcik, *Drug Pricing System Nixed by Pact*, 40 Bus. Ins. 1 (Oct. 16, 2006) (Ex. 19) (Allegations that First DataBank "conspired with McKesson to arbitrarily increase AWP markups to 25% from 20% between 2002 and 2005, resulting in overpayment to PBMs and pharmacies."). <br><br> Press Release, Prescription Access Litigation Project, *Settlement of Conspiracy Case Forces Major Restructuring of Prescription Drug Pricing System* (Oct. 6, 2006) (Ex. 18) ("The case alleges that this benefitted McKesson because it benefitted McKesson's customers (pharmacies and large institutional buyers), who would thus be more likely to purchase their drugs from McKesson than from a competing wholesaler."). <br><br> Liz Kowalczyk, *Lawsuit Targets 28 Drug Makers*, Boston Globe, Dec. 21, 2001, at C1 (Ex. 23) (reporting that AWP is inflated and that in 1997, "Medicare's reimbursement for 22 drugs studied was $447 more than the actual wholesale price"). |
| Third Amended Complaint ¶ 138 (Jan. 26, 2009) <br><br> Second Amended Complaint ¶¶ 78, 82, 89, 90 (Nov. 30, 2006) | ABC "conspired with First DataBank to continue reporting fictitious retail prices and/or markups and to further inflate the spread between the AWP and the WAC." <br><br> This benefited ABC because it "increas[ed] the profits of their retail customers who would then be able to pay higher | Class Action Compl. at ¶ 12, *N.E. Carpenters* (June 2, 2005) (Ex. 4) ("Both McKesson and First Data had economic and business reasons for reaching an understanding that McKesson would artificially raise the WAC-to-AWP spread and that First Data would publish the increased AWPs. . . . McKesson implemented this Scheme in order to provide a benefit to those important retail pharmacy clients as well as its own pharmacy related business."); *id.* ¶ 127 ("First Data and McKesson continued their collaboration to ensure that First Data's WAC/AWP markups mimicked those of McKesson, and vice-versa."). |

11

U.S. ex rel Morgan v. Express Scripts, Inc., et al.　　　　　　　　　　　　　　　　　　　　　　　　APPENDIX A
No. 05-CV-1714(DMC)(JAD)

| **Complaint Paragraph** | **Allegation** | **Prior Disclosure** |
|---|---|---|
| | prices for the drugs and also be able to pay for high profit-margin data services offered by the Wholesalers." | First Am. Compl. at ¶ 134(a), *N.E. Carpenters* (July 21, 2006) (Ex. 9) (alleging that McKesson's ability to "cause First Data to report a higher AWP [enabled McKesson] . . . to curry favor with retailers" and that "a significant portion of [McKesson's] revenue growth came from . . . large retail chains."). <br><br> Compl. at ¶ 23, *New York ex rel. Spitzer v. Pharmacia Corp.*, No. 904-03 (N.Y. Sup. Ct. Albany Cnty. Feb. 13, 2003) (Ex. 30) ("The difference between the amount a physician, other healthcare provider or pharmacist pays for a drug and the amount Medicare (or other healthcare program) reimburses for that drug is profit to the provider. . . .  In the pharmaceutical industry, this guaranteed profit is referred to as the 'spread.'"). <br><br> Compl. at ¶¶ 49-50, *Commonwealth ex rel. Stumbo v. Alpharma, Inc.*, No. 04-CI-1487 (Ky. Cir. Ct. Franklin Cnty. Nov. 4, 2004) (Ex. 33) ("Since at least 1992, defendants have published false and inflated AWPs for virtually all of their drugs.  One purpose of this scheme was and is to create the spread between the true wholesale price of a drug and the false and inflated AWP and thereby increase the incentive for providers to choose the drug for their patients. . . . Defendants often market their products by pointing our (explicitly and implicitly) that their drug's spread is higher than the spread of a competing drug."). <br><br> Barbara Martinez, *A "Survey" of One Company*, Wall Street Journal, Oct. 6, 2006, at A1 (Ex. 15) (In an internal email on Jan. 7, 2002, McKesson's director of brand pharmaceutical product management, Robert James, wrote that "our successes recently and during this past year include raising the AWP spreads" on many drugs and "we have an opportunity to 'market' our efforts now."). |

| **Complaint Paragraph** | **Allegation** | **Prior Disclosure** |
|---|---|---|
| | | *Drug Price Publisher Will Stop Practice in Settlement*, St. Louis Post-Dispatch, Oct. 7, 2006, at A33 (Ex. 20) (Allegations that First DataBank "conspired with drug wholesaler McKesson Corp. to manipulate the price of medicines to benefit that company's customers"). <br><br> *Managed Care Pharmacists to Review Payment Methods*, Inside CMS (Inside Washington Publishers), Nov. 2, 2006 (Ex. 21) (detailing "allegations that First DataBank conspired with McKesson Corp., a wholesaler, to maximize profits . . . by arbitrarily inflating the price 'spread' between AWP and the wholesale acquisition cost" and noting that "[a]s part of the settlement, First Databank will immediately roll back the 'spread' between AWP and the [WAC] from 25 percent to 20 percent for most top-selling drugs."). <br><br> *Class-Action Suit Against Drug Giants May Accelerate AWP Demise*, Inside CMS (Inside Washington Publishers), Nov. 16, 2006 (Ex. 22) ("The [plaintiffs] had accused First DataBank of conspiring with McKesson Corp., a wholesaler, to maximize profits by arbitrarily inflating the price 'spread' between AWP and the wholesale acquisition cost, a rate wholesalers often use when selling drugs to pharmacies.") <br><br> Press Release, Prescription Access Litigation Project, *Settlement of Conspiracy Case Forces Major Restructuring of Prescription Drug Pricing System* (Oct. 6, 2006) (Ex. 18) ("The plaintiffs alleged that First Databank and McKesson illegally used the increased markups as a symbiotic business strategy for their respective drug-wholesaling and drug price publication production. The case claimed that McKesson and First Databank agreed to increase the 'spread' between AWP and WAC from |

*U.S. ex rel Morgan v. Express Scripts, Inc., et al.*  APPENDIX A
No. 05-CV-1714(DMC)(JAD)

| Complaint Paragraph | Allegation | Prior Disclosure |
|---|---|---|
| | | 20% to 25% on hundreds of drugs, to benefit McKesson's customers and the purchasers of First Databank's pricing guides."); ("The case alleges that this benefitted McKesson because it benefitted McKesson's customers (pharmacies and large institutional buyers), who would thus be more likely to purchase their drugs from McKesson than from a competing wholesaler."). |
| Third Amended Complaint ¶ 139 (Jan. 26, 2009)<br><br>Second Amended Complaint ¶ 82 (Nov. 30, 2006) | ABC "knew that the further inflated AWP would accrue to [its] benefit through [its] ownership interest in retail pharmacies," specifically Good Neighbor Pharmacy and PharMerica. | Memo. in Support of Defendant McKesson's Motion to Dismiss the Compl. at 4, *N.E. Carpenters* (Oct. 19, 2005) (Ex. 5) ("Because retail pharmacies typically buy pharmaceuticals from wholesalers based on a markup over WAC, but are reimbursed based on a percentage off of AWP, larger 'spreads' between WAC and AWP afford retail pharmacies and other middlemen like PBMs opportunities for larger profits.").<br><br>First Am. Class Action Compl. at ¶ 134(e), *N.E. Carpenters* (July 21, 2006) (Ex. 9) ("The Scheme also directly benefitted McKesson's own pharmacy business. McKesson has an operation called McKesson Valu-Rite, which consists of a nationwide network of independent pharmacies that are connected to McKesson. McKesson manages 275 pharmacies in 35 states and employs 900 pharmacists.").<br><br>Press Release, Prescription Access Litigation Project, *Settlement of Conspiracy Case Forces Major Restructuring of Prescription Drug Pricing System* (Oct. 6, 2006) (Ex. 18) ("The case alleges that this benefitted McKesson because it benefitted McKesson's customers (pharmacies and large institutional buyers), who would thus be more likely to purchase their drugs from McKesson than from a competing wholesaler."). |

14

*U.S. ex rel Morgan v. Express Scripts, Inc., et al.* APPENDIX A
No. 05-CV-1714(DMC)(JAD)

| Complaint Paragraph | Allegation | Prior Disclosure |
|---|---|---|
| Third Amended Complaint ¶ 142 (Jan. 26, 2009) <br><br> Second Amended Complaint ¶¶ 86, 92, 96 (Nov. 30, 2006) | Wholesalers encouraged their customers to use First DataBank's Blue Book AWP | First Am. Class Action Compl. at ¶ 14, *N.E. Carpenters* (July 21, 2006) (Ex. 9) (McKesson "specified in its dealings with pharmaceutical companies, that First Data's AWP would be the AWP used for contract pricing purposes as opposed to the other published AWPs"); *id.* ¶ 108 (alleging that McKesson knew that First DataBank's AWPs were often marginally higher than "other publications" and that "McKesson made clear to its retail pharmacy customers 'that in almost every case retail prices will go up helping increase gross profit.' McKesson even gave instructions to its retail customers as to how to electronically access the changed 'markup percentages' in order to access the increased gross profit that would be earned at the expense of plan sponsors and consumers by shifting to First Data publication of AWP."); *id.* ¶ 165 ("First Data and McKesson each has a common purpose of perpetuating the use of AWPs as a benchmark for reimbursement in the pharmaceutical industry."). <br><br> Compl. at ¶¶ 65-66, *Commonwealth ex rel. Pappert v. TAP Pharm. Prods., Inc.*, No. 212-MD-2004 (Pa. Cmwlth. Ct. Mar. 10, 2004) (Ex. 31) ("The Defendants encourage providers and other purchasers of Defendants' drugs to use the AWPs set by the Defendants in billing the Commonwealth and Pennsylvania Consumers. . . . The AWPs reported by Defendants do not represent prices actually paid in the Commonwealth of Pennsylvania by any medical provider or other purchaser of Defendants' drugs."). |
| Third Amended Complaint ¶¶ 131, 144, 243 (Jan. 26, 2009) <br><br> Second Amended Complaint | Wholesalers "were well aware that First DataBank was in fact not conducting … 'surveys' of actual wholesale prices," but "permitted First | Class Action Compl. at ¶¶ 6-8, 109, 115, 129-130, *N.E. Carpenters* (June 2, 2005) (Ex. 4) (First DataBank AWP was fabricated and First DataBank did not use pricing information from wholesalers to determine AWPs); *id.* ¶ 110 ("By around 2000, only a few national wholesalers existed. . . . Most of those |

15

*U.S. ex rel Morgan v. Express Scripts, Inc., et al.* APPENDIX A
No. 05-CV-1714(DMC)(JAD)

| Complaint Paragraph | Allegation | Prior Disclosure |
|---|---|---|
| ¶¶ 80, 87, 93, 108, 160 (Nov. 30, 2006) | DataBank to represent to the contrary" and "knowingly concealed their actual prices." | wholesalers professed never to have participated in First Data 'surveys' at any time. By the end of 2001, it appears that virtually all communications by wholesalers back to First Data regarding the WAC/AWP markup and/or AWP generally were expressly prohibited by management with the singular exception of McKesson."). <br><br> Memo. in Support of Defendant McKesson's Motion to Dismiss the Compl. at 2, *N.E. Carpenters* (Oct. 19, 2005) (Ex. 5) ("Although FDB represented that it surveyed all of the national wholesalers and calculated a weighted average of the wholesalers' own prices, plaintiffs allege that, in reality, FDB was secretly surveying only McKesson."). <br><br> Memo. in Support of Class Cert. at 6 n.14, *N.E. Carpenters* (July 17, 2006) (Ex. 8) ("Even the wholesalers that were 'surveyed' in the 1990's apparently did not know that they were being surveyed. Most professed never to have participated in First Data 'surveys' at any time. By the end of 2001, it appears that virtually all communications by wholesalers back to First Data regarding the WAC/AWP markup and/or AWP generally were expressly prohibited by management with the singular exception of McKesson."). <br><br> First Am. Compl. at ¶ 111, *N.E. Carpenters* (July 21, 2006) (Ex. 9) ("During most times during the 1990s, even the wholesalers that were 'surveyed' apparently did not know that they were being surveyed. Since the wholesalers themselves purchased their information about AWP from First Data itself, most found circular at best the notion that First Data would 'survey' them to find out AWP information that the wholesalers themselves had already purchased from First Data. . . . By around 2000, only a |

16

*U.S. ex rel Morgan v. Express Scripts, Inc., et al.* APPENDIX A
No. 05-CV-1714(DMC)(JAD)

| Complaint Paragraph | Allegation | Prior Disclosure |
|---|---|---|
| | | few national wholesalers existed and were on the short list for First Data 'surveys.' Most of these wholesalers professed never to have participated in First Data 'surveys' at any time."); *id.* ¶ 121 ("Beginning sometime in late 2001 or early 2002, First Data, by agreement with McKesson, limited its' [sic] purported 'surveys' to McKesson and did not 'survey' other wholesalers. . . . First Data then published the new figures . . . without contacting any other wholesaler, in spite of publicly stating it contacted more than one wholesaler to obtain a 'weighted average.'").<br><br>Affidavit of Denny Lindell at ¶¶ 2-10, AWP MDL (Mar. 1, 2006) (Ex. 6) ("I have no recollection whatsoever of being 'surveyed' by Ms. Morgan, or anyone from First Data Bank [sic], regarding the pricing mark-up between WAC and AWP. . . . In addition, I am informed that the Company checked with other individuals within ABC … and found no employee who recalled being 'surveyed' by Ms. Morgan.).<br><br>Barbara Martinez, *A "Survey" of One Company*, Wall Street Journal, Oct. 6, 2006, at A1 (Ex. 15) (A spokesman for ABC says that the company did not participate in any First DataBank surveys during the period when the price increases were occurring and still does not); *id.* (Noting that in a January 2005 deposition, Kay Morgan was asked: "Was First DataBank receiving any information regarding markups from any other company other than McKesson?" She responded: "No sir, we were not."); ("It emerged in the [AWP MDL] litigation that the only wholesaler in the 'survey,' at least in its final years, was McKesson.").<br><br>JoAnne Wojcik, *Drug Pricing System Nixed by Pact*, 40 Bus. Ins. 1 (Oct. 16, 2006) (Ex. 19) ("Though First DataBank claimed its AWP reflected a survey of national drug wholesalers, it turned |

17

*U.S. ex rel Morgan v. Express Scripts, Inc., et al.* APPENDIX A
No. 05-CV-1714(DMC)(JAD)

| Complaint Paragraph | Allegation | Prior Disclosure |
|---|---|---|
| | | out only McKesson participated in the survey."). *First DataBank Agrees to Settle Price Fixing Suit*, Pharma Marketletter (Marketletter Publ'ns, Ltd.), Oct. 16, 2006 (Ex. 16) ("[I]t emerged that McKesson, since 2003, was the only wholesaler whose prices were utilized by First Databank to produce AWP tables."). Press Release, *McKesson Corporation Statement Regarding First DataBank Settlement* (Oct. 6, 2006) (Ex. 24) ("First DataBank has affirmed in an earlier lawsuit . . . that it never told McKesson that at times McKesson was the only wholesaler being surveyed."). DEP'T OF HEALTH & HUMAN SERVS., OFFICE OF INSPECTOR GENERAL, MEDICAID'S USE OF REVISED AVERAGE WHOLESALE PRICES, at 6 (Sept. 2001) (Ex. 11) ("Even though First DataBank is required by its agreement with the NAMFCU to collect updated prices for these drugs, some States reported that First DataBank expressed little interest in updating the revised prices. According to these States, First DataBank only planned on reporting revised prices based on what the Justice Department and the NAMFCU provided them. Meanwhile, States were unsure if the Justice Department and the NAMFCU were planning to provide updated pricing information to First DataBank and/or add any new national drug codes to the pricing revisions."). |
| Third Amended Complaint ¶ 236 (Jan. 26, 2009) Second Amended Complaint ¶ 153 (Nov. 30, 2006) | ABC "falsely represent[ed] that the use of First DataBank's databases would result in the least expensive prescription drugs and/or most reliable AWP." | Class Action Compl. at ¶ 179(a), *N.E. Carpenters* (June 2, 2005) (Ex. 9) ("[K]nowing of the use of AWP by payors, and despite knowledge as to representations that AWPs were established in part by use of surveys, and were 'reliable' and 'accurate,' defendants artificially raised AWPs by increasing the WAC-to-AWP spread by 5% thereby allowing publication of AWPs that |

18

U.S. ex rel Morgan v. Express Scripts, Inc., et al.	APPENDIX A
No. 05-CV-1714(DMC)(JAD)

| **Complaint Paragraph** | **Allegation** | **Prior Disclosure** |
|---|---|---|
| | | were even more inaccurate and unreliable."); *id.* ¶ 179(d) ("Defendants omitted material information known to them in order to induce payors to use an inflated AWP and pay an inflated price for drugs."). <br><br> Compl. at ¶ 24, *State v. Abbott Labs.*, No. 04-1709 (Wis. Cir. Ct. Dane Cnty. June 3, 2004) (Ex. 32) ("Knowing that the nation's drug reimbursement was dependent on their published wholesale prices, defendants, at least as early as 1992, embarked on an unlawful scheme to distort the system to their advantage. . . . First, defendants systematically caused to be published arbitrary and inflated wholesale prices—AWPs and/or WACs—for their drugs.  Second, defendants deeply discounted the published wholesale prices to some of their customers.  And, third, defendants engaged in an elaborate and successful effort to keep the extent and nature of their discounts secret."). <br><br> Compl. at ¶¶ 48-49, *State v. Abbott Labs., Inc.*, No. 05CH02474 (Ill. Cir. Ct. Cook Cnty. Feb. 7, 2005) (Ex. 35) ("Illinois' drug reimbursement system has been and remains almost completely dependent on defendants' reported wholesale prices.  Defendants know this fact and rely on it to make their AWP scheme work.  Defendants have illegally misrepresented the true AWP for virtually all of their drugs."). <br><br> Compl. at ¶ 2, *State v. Dey, Inc.*, No. A0402047 (Ohio Ct. Com. Pl. Hamilton Cnty. Mar. 9, 2005) (Ex. 36) ("Defendants have fraudulently concealed actual wholesale prices in order to induce reliance on the false wholesale prices that Defendant periodically and regularly reported to the public.  Defendants are aware that ODJFS and other state agencies and instrumentalities relied, and continue to rely, in setting prescription drug reimbursement rates |

*U.S. ex rel Morgan v. Express Scripts, Inc., et al.* APPENDIX A
No. 05-CV-1714(DMC)(JAD)

| Complaint Paragraph | Allegation | Prior Disclosure |
|---|---|---|
| | | on information disseminated by Defendants which purports to be true average wholesale prices and wholesale acquisition costs."). <br><br> Compl. at ¶ 109, *State v. Abbott Labs., Inc.*, No. C2005-2021 (Miss. Ch. Ct. Hinds Cnty. Oct. 20, 2005) (Ex. 38) ("The Defendants knowingly, willfully and/or intentionally represented, through their acts and omissions, that the AWP information provided to the reporting services was true and correct and could be fully and completely relied upon . . . as the average price charged by wholesalers to providers for a Defendant's given drug, when in fact, the AWP information was grossly inflated."). |
| Third Amended Complaint ¶¶ 4- 6, 18, 175-179, 186 (Jan. 26, 2009) <br><br> Second Amended Complaint ¶¶ 18, 69, 119-123 (Nov. 30, 2006) | There was a 2% and later over 4% discrepancy between the AWPs reported in Blue Book and Red Book and ABC was complicit in the scheme to inflate. | First Am. Class Action Compl. at ¶ 108, *N.E. Carpenters* (July 21, 2006) (Ex. 9) ("McKesson knew that which was quietly known by a few of the national chain drug retailers and First Data itself—that many of the AWPs, and the timing of the reported AWPs, reported by First Data's electronic files were often, albeit marginally, higher than other publications."). <br><br> JoAnne Wojcik, *Drug Pricing System Nixed by Pact*, 40 Bus. Ins. 1 (Oct. 16, 2006) (Ex. 19) ("In aggregate, (Medi-Span's listed prices) must be 1% to 2% lower across a broad spectrum of drugs" compared to First DataBank's Blue Book). <br><br> Press Release, Prescription Access Litigation Project, *Settlement of Conspiracy Case Forces Major Restructuring of Prescription Drug Pricing System* (Oct. 6, 2006) (Ex. 18) ("The milestone settlement is forecasted to result in a 4 percent rollback of prices on hundreds of drugs which represent 95 percent of the nation's retail branded drug sales."). |

20