### UNITED STATES DISTRICT COURT
### DISTRICT OF NEW JERSEY

| | |
|---|---|
| UNITED STATES OF AMERICA, ex rel. DAVID MORGAN, | Civil Action No. 05-cv-01714 (DMC) (JAD) |
| Plaintiff, | |
| | **ECF CASE** |
| v. | |
| EXPRESS SCRIPTS, INC., et al., | **Returnable on September 13, 2013** |
| Defendants. | |

### DECLARATION OF DAVID P. MORGAN

David P. Morgan hereby declares, pursuant to 28 U.S.C. § 1746, as follows:

1.      I am over eighteen years of age and am competent to testify.  I reside at 3645 Dutch Cemetery Road, Marysville, Pennsylvania.

2.      The statements contained in this Declaration are based on my personal knowledge and, to the best of my knowledge, are true and accurate.

3.      Starting in 1999 I began to notice unaccountable discrepancies between First DataBank's ("FDB") *Blue Book* electronic drug pricing list, generated on a monthly basis ("*Blue Book*"), *Red Book* and Medispan prices claimed to represent Average Wholesale Prices ("AWP"). The AWP prices had been consistently identical.

4.      As part of an audit procedure, I re-priced all of our clients' drug claims using both pricing sources. I calculated the impact of First DataBank's inflated AWP on our client's

1

prescription spend. That percentage continued to increase over time as First DataBank added more drugs to the scheme.

5.    The fundamental differences between First DataBank and *Redbook*, make it very difficult to run a comparison to identifying the different AWPs for the drugs. Thus, it would be necessary to undertake a detailed analysis to determine whether First DataBank was increasing specific drug prices over *Redbook*.

6.    Very few, if any, independent auditors would subscribe to both *Blue Book* and *Red Book*, much less compare specific drug prices from the two sources.   The purchase price of each drug file is approximately $30,000 per year. There are attendant program and systems analysts costs associated with data conversions and the actual auditing costs as well.

7.    While conducting an audit in 2003, I challenged Caremark to explain why they were charging more than the *Red Book's* lesser AWP.  Caremark responded by sending a copy of a series of computer-generated screen shots, providing the pricing histories for the previous ten years for approximately 250 drugs.  Since these prices were based on the *Blue Book*, this provided me with a panoramic view of First DataBank's AWP pricing and how it changed over time.

8.    With *Red Book* and Caremark's audited pricing data that contained the *Blue Book* pricing information, my wife, Dorothy Morgan and I sat at the kitchen table of our house and compared the *Redbook's* AWP to First DataBank's *Blue Book* AWP prices for each given price change date.

9.     As we compared more and more of the AWPs, a pattern began to form.  With the data from all 250 drugs I developed a proprietary algorithm that performed a regression analysis.

10.    From that analysis, it became clear that the discrepancies were not random, but, rather, a definite, consistent pattern emerged. Examining the history of these prices, it became clear that First DataBank's inflated AWP's were intentional.

11.    As a result of my analysis, I determined that *Blue Book* was actually setting the prices on specific brand names drugs at a constant rate of 4.16%[1] higher over the prices reported in *Red Book*.

12.    In an attempt to alert CVS/Caremark Corporation ("Caremark") to the manipulation, in October 2003, I flew to Caremark's headquarters in Illinois.  Instead of welcoming the discovery and vowing to switch their pricing source from First DataBank to *Red Book*, Caremark assembled a team of accountants and attorneys, who asked that I not discuss this information outside of their offices.

13.    As a result of my audits for various clients, I reviewed many Caremark contracts. Each contract contained a paragraph that stated that, if there was a fundamental change in the industry pricing, Caremark would amend the contracts to make the parties whole.

14.    I also noticed that Caremark had begun moving those drugs with the higher AWPs to its preferred formularies as another way to increase profits.  My clients ended up paying more for

---

[1]4.16 percent, is rounded as First DataBank and *Redbook* each use a different number of decimal places in reporting their AWP prices.

the preferred drugs and their employees were induced to use the more expensive drug by paying a lesser expensive copay.

15.     I have also conducted several audits on behalf of clients who used Medco Health Solutions, Inc. ("Medco") to administer their prescription drug plan. These audits showed that Medco was aware of First DataBank's inflated AWP scheme and chose to use the inflated AWP.

16.     As a result of my audits for various clients, I reviewed many Medco contracts.  Each contract contained a paragraph that stated that, in the event of a material change in the method of the calculation of the average wholesale price, Medco would readjust its charges to make the parties whole.

17.     I noticed that Medco also begun moving those drugs with the higher AWPs to its preferred formularies as another way to increase profits as result of the higher drug cost.  My clients ended up paying more for the preferred drugs and their employees were induced to use the more expensive drug by paying a lesser expensive copay.

18.     I have also conducted several audits on behalf of clients where I reviewed claims data for Express Scripts, Inc. ("ESI"). These audits also uncovered the pricing differential outlined above.

19.     As a result of my audits for various clients, I reviewed many ESI contracts.  Each contract contained a paragraph that stated that, in the event of a material change in the method of the calculation of the average wholesale price, ESI would readjust its charges to make the parties whole.

4

20.    I noticed that ESI also begun moving those drugs with the higher AWPs to its preferred formularies as another way to increase profits as result of the higher drug cost. My clients ended up paying more for the preferred drugs and their employees were induced to use the more expensive drug by paying a lesser expensive copay.

21.    I contacted a drug wholesaler, Drug House, in Harrisburg, Pennsylvania and asked whether First DataBank contacted it to obtain its prices.  A representative from Drug House told me no one ever contacted them from First DataBank.

22.    In furtherance of my review, I called the pricing director at AmerisourceBergen Corporation ("AmerisourceBergen") in early 2002.  The director seemed very interested in my call. He informed me that he received a number of similar inquiries and told me and anyone else who asked, that First DataBank never contacted AmerisourceBergen for pricing information.  It became apparent to me that AmerisourceBergen was aware that First DataBank was making representations that AmerisourceBergen was included in its pricing survey.

23.    At some point during an audit, I became aware of communications between First DataBank and AmerisourceBergen that indicated that AmerisourceBergen knew of the pricing differential. Pharmacies that purchased drugs from AmerisourceBergen began calling and informing AmerisourceBergen that the AWP prices that AmerisourceBergen was placing on the bottles, did not match First DataBank's AWP.

24.    It became clear to me that AmerisourceBergen benefitted from the scheme because their pharmacies were using the inflated AWPs to bill both private and Government contracts at the higher AWPs.

25.     In total, I and my support personnel spent in excess of 700 hours undertaking this analysis at a cost of approximately $100,000.

26.     Once I believed I had compiled enough evidence to show a fraud upon the United States and State Governments, starting in 2004, I, with assistance from counsel, disclosed the details of my discovery to James Sheehan, an Assistant United States Attorney in the Eastern District of Pennsylvania.

27.     Between the middle of 2004 and March 28, 2005, when the Complaint was filed, I prepared detailed factual analyses, charts, and disclosures for the Federal Government.

28.     These disclosures included, but were not limited to, the fact that the Government was overpaying drug claims based on *Blue Book*'s inflated AWP prices, because First DataBank was improperly marking up AWP by 4.16% as compared to *Red Book* for a large and increasing number of brand name prescription drugs.

29.     This scheme is different than those reported in the media and various court cases. As a matter of fact, it may continue to the present day.  My methodology, however, compared First DataBank's AWP to *Red Book's* AWP and the difference in the inflated brand drugs continues to be 4.16%. I identified over 8,000 brand drugs, with new drugs continuously, being added to the "inflated" list.

30.     In addition to my disclosures to Mr. Sheehan, on or about January 18, 2005, I, with assistance from counsel, provided disclosures and presented my potential case to Deputy Chief United States Attorney (now Judge) Susan Steele and Assistant United States Attorney (now Judge) Stuart Minkowitz in the District of New Jersey.

6

31.     These initial disclosures specifically questioned the veracity of First DataBank's public statements that it calculates *Blue Book* drug prices by "surveying wholesalers in the marketplace."

32.     I also disclosed that it was highly unlikely that, if First DataBank was actually conducting surveys in the marketplace, the prices of many of its drugs would *not* be consistently 4.16% higher than *Red Book*.  In total, my analysis showed  more than 8,000 National Drug Codes for brand name drugs, were affected by the 4.16% scheme; s*igni*ficantly more than any other case, including the 1,400 National *Drug Co*des listed in the settlement of the unrelated AWP case.

33.     To demonstrate the scheme, I provided the Government with a chart showing a consistent 4.16% mark up for a range of drugs including, but not limited to: Cipro (00026851351), Paxil (00029321120), Peg-Intron (00085127901), Singulair (00006011731), Wellbutrin (00173013555), Vioxx 25mg (00006011031), Patonol 0.1% 5ml (00065027105), Augmentin 400mg 100ml (00029609251), Combivent (00597001314), and Accupril 10mg (00071053023).  Based on the consistency, I concluded that the AWP price inflation was the result of purposeful manipulation.

34.     I also disclosed to the Government that Defendant PPBMs − Express Scripts, Caremark, and Medco - knew about this fraud and exploited it in their contracts with customers. For example, these PBMs specifically included provisions in their contracts with government-funded health plans that required the use of First DataBank's *Blue Book* for drug pricing.  The

PBM's also stated in the contracts that the PBM could choose the pricing source (and then chose First DataBank's *Blue Book*).

35.     I also showed the Government that the PBMs mail order facilities purchased drugs at a percentage off of Wholesale Acquisition Cost ("WAC")[2].  The PBM's then turned around and billed the Government based on the inflated AWP, keeping the additional dollar spread caused by the inflated AWP scheme.

36.     I, and/or my attorneys, disclosed to the Government that AmerisourceBergen was aware of, and exploited the scheme.   I informed the Government of my call to AmerisourceBergen.  I reported that I had then reviewed the actual prices AmerisourceBergen reported in the data I had collected to determine that its prices varied from First DataBank's prices.

37.     My disclosure included the fact that the Government was paying fraudulent reimbursement claims based on *Blue Book*'s published AWP prices, which inflated drug prices paid by the Government across the board by improperly marking up AWP by 4.16% as compared to *Red Book* for a large and increasing number of brand name prescription drugs, and eventually the vast majority of them.

38.     On March 28 and 30, 2005, my attorneys filed three complaints against First DataBank and the three Defendant PBMs in the District of New Jersey and the Eastern District of Pennsylvania.  These cases were eventually consolidated in the District of New Jersey.

---

[2] WAC: the price that the PBM's and pharmacies use to purchase drugs.  AWP is the price paid by the client.  The higher the AWP, the more money the PBM makes.

39.     Until I reviewed the Defendants' Motions to Dismiss between June and July 2013, I

had never read or heard of the following − as such I never relied on them in any manner during

the course of my investigation concerning the allegations contained in the complaint:

a.     *Brown, et al. v. Express Scripts, Inc.*, Civil Act. No. 3:04-cv-01822-AWT (D. Conn.);

b.     *American Federation of State, County & Municipal Employees v. AdvancePCS, et al.*, Civil Action No. BC292227 (Cal. Super. Ct.);

c.     *Hot Spring County Solid Waste Authority v. Hatcher Enterprises, Inc*., et al., Case No. CV-20040135-1 (Ark. Cir. Ct. June 28, 2004);

d.     *Jones v. Merck-Medco Managed Care, LLC*, CV-S-02-0707-PMP-PAL (D. Nev. May 21, 2002);

e.     *Irwin v. AdvancePCS, Inc., et al.*, Case No. RG03088693 (Cal. Super. Ct. March 26, 2003);

f.     *Group Hospitalization and Medical Services d/b/a CareFirst Blue Cross Blue Shield*, Civil Action No. L414403 (N.J. Super. Ct. July 21, 2003);

g.     *Brady Enterprises, Inc. v. Medco Health Solutions, Inc., et al*., Civil Action No. 2:03-cv-04730-CDJ (E.D. Pa. August 15, 2003);

h.     *Cameron v. Express Scripts, Inc.*, Civil Action No. 4:03-cv-01520-HEA (E.D. Mo. October 23, 2003);

i.     *Mixon, et al. v. Express Scripts, Inc*., Civil Action No. 4:03-cv-01519-HEA (E.D. Mo. October 23, 2003);

j.     *New York v. Express Scripts, Inc.*, et. al., Civil Action No. 466904 (N.Y. Sup. Ct. August 4, 2004);

k.     *Wagner, et al. v. Express Scripts, Inc*., et al., 04 Civ. 1018 (WHP) (S.D.N.Y. November 10, 2004);

l.     *Central Laborers' Welfare Fund v. Express Scripts, Inc., et al*., No. 04-0791-MJR (S.D. Ill. December 6, 2004);

m.     William Sherman, *RX Ripoffs Hard to Swallow: State Probing Drug Pricing and Sales Tactics*, N.Y. Daily News (Jul. 27, 2003);

n.     *Pharmacy Benefit Managers Charged with Inflating*, PR Newswire, (Mar. 18, 2003) ;

o.     Darren M. Allen, *Probe of Express Scripts Called For*, The Times Argus, Jul. 9, 2003;

p.     Elizabeth MacDonald, *Drug Lord*, Forbes, (Feb. 16, 2004);

q.     Linda Loyd, *Role of Drug-Benefits Managers under Scrutiny: They Were Formed to Hold Down Prices, But Pursuit of Profit May Be Hurting Clients, Critics Say*, Philadelphia Inquirer, (May 2, 2004);

r.     David Schepp, *Plaintiffs Argue over $42.5 Million*, The Journal News, (May 31, 2003);

s.      Jeremy Olson, *Firms Profit in Markup of Generics*, <u>Omaha World-Herald</u>, (Apr. 26, 2003);

t.      *State v. Abbott Labs., Inc.*, No. 06-1-0720-04-EEH (Haw. 1st Cir. Ct. Apr. 27, 2006);

u.      *State v. Abbott Labs., Inc.*, No. C2005-2021 (Miss. Ch. Ct. Hinds Cnty. Oct. 20, 2005);

v.      *City of New York v. Abbott Labs.*, Inc., MDL No. 1456 (D. Mass. June 22, 2005);

w.      *State v. Dey, Inc.*, No. A0402047 (Ohio Ct. Com. Pl. Hamilton Cnty. Mar. 9, 2005);

x.      *State v. Abbott Labs., Inc.*, No. 05CH02474 (Ill. Cir. Ct. Cook Cnty. Feb. 7, 2005);

y.      *State v. Abbott Labs.*, No. CV-05-219 (Ala. Cir. Ct. Mont. Cnty. Jan. 26, 2005);

z.      *Commonwealth ex rel. Stumbo v. Alpharma, Inc.*, No. 04-CI-1487 (Ky. Cir. Ct. Franklin Cnty. Nov. 4, 2004);

aa.     *State v. Abbott Labs.*, No. 04-1709 (Wis. Cir. Ct. Dane Cnty. June 3, 2004);

bb.     *Commonwealth ex rel. Pappert v. TAP Pharm. Prods.*, Inc., No. 212-MD-2004 (Pa. Cmwlth. Ct. Mar. 10, 2004);

cc.     *New York ex rel. Spitzer v. Pharmacia Corp.*, No. 904-03 (N.Y. Sup. Ct. Albany Cnty. Feb. 13, 2003);

dd.     *State v. Pharmacia Corp.*, No. 02-9660 (Minn. Dist. Ct. Hennepin Cnty. June 18, 2002);

ee.     *State ex rel. McGrath v. Abbott Labs.*, Inc., No. DV-2002-4155 (Mont. Dist. Ct. Lewis and Clark Cnty. Feb. 25, 2002);

ff.     *State v. Abbott Labs.*, Inc., No. CV02-00280 (Nev. Dist. Ct., Washoe Cnty. Jan. 17, 2002);

gg.     Deborah Caulfield, Rybak, *Drugmaker Sued: Attorney General Mike Hatch Says Government Insurers are Being Charged Huge Markups on Drugs*, <u>Star Tribune</u>, (June 19, 2002);

hh.     Alice Dembner, *Medicare Waste Raises Cost of Drugs by $1B*, <u>Boston Globe</u>, (Sept. 21, 2001);

ii.     Dep't of Health & Human Servs., Office of Inspector General, *Variation in State Medicaid Drug Prices*, (September 2004);

jj.     Dep't of Health & Human Servs., Office of Inspector General, Medicaid's Use of Revised Average Wholesale Prices (Sept. 2001);

kk.     Dep't of Health & Human Servs., Office of Inspector General, <u>Memorandum: An Additional Source of Average Wholesale Price Data in Pricing Drugs and Biologicals Covered By the Medicare Program</u>, (September 8, 2000);

ll.     146 Cong. Rec. E2037-04 (daily ed. Oct. 31, 2000) (statement of Rep. Pete Stark);

mm.     *House Committee Probes Medicaid Fraud*, Drugs.com (June 26, 2003);

nn.     Letter from Rep. W.J. "Billy" Tauzin to ABC (June 26, 2003);

oo.     149 Cong. Rec. E1415-02 (daily ed. Jul. 8, 2003) (statement of Rep. James C. Greenwood);

pp.     Steve Bailey, *Profits v. People*, <u>Boston Globe</u>, Apr. 10, 2002;

10

    qq.    Bill Brubaker, *Firms in Talks on Overbilling for Medicare, Medicaid Drugs*, <u>Washington Post</u>, May 11, 2000;

    rr.    Barbara Martinez, *A "Survey" of One Company*, <u>Wall Street Journal</u>, Oct. 6, 2006;

    ss.    *Managed Care Pharmacists to Review Payment Methods*, Inside CMS (Inside Washington Publishers), (Nov. 2, 2006);

    tt.    Theresa Agovino, *Publisher Agrees to Stop Printing List of Drug Prices*, <u>Memphis Commercial Appeal</u>, (Oct. 8, 2006);

    uu.    *First DataBank Agrees to Settle Price Fixing Suit*, Pharma Marketletter (Marketletter Publ's, Ltd.), (Oct. 16, 2006);

    vv.    Liz Kowalczyk, *Lawsuit Targets 28 Drug Makers*, <u>Boston Globe</u>, (Dec. 21, 2001);

    ww.    *Class-Action Suit Against Drug Giants May Accelerate AWP Demise*, Inside CMS (Inside Washington Publishers), Nov. 16, 2006;

    xx.    *First DataBank Agrees to Settle Price Fixing Suit*, Pharma Marketletter (Marketletter Publ's, Ltd.), Oct. 16, 2006;

    yy.    JoAnne Wojcik, *Drug Pricing System Nixed by Pact*, 40 Bus. Ins. 1 (Oct. 16, 2006);

    zz.    Press Release, *Prescription Access Litigation Project, Settlement of Conspiracy Case Forces Major Restructuring of Prescription Drug Pricing System* (Oct. 6, 2006);

    aaa.    *Drug Price Publisher Will Stop Practice in Settlement*, <u>St. Louis Post-Dispatch</u>, Oct. 7, 2006.

    40.    In the course of investigating and preparing my Complaint, I never relied on the following in any manner:

    a.    *Minshew v. Express Scripts, Inc.*, Cause No. 4:02-CV-1503SNL (E.D. Mo. June 30, 2003).

    b.    *Fidelity Insurance Co., et al. v. Express Scripts, Inc., et al.*, Civil Action No. 03cv1240 (Montgomery County, Maryland) ("Fidelity Litigation");

    c.    *American Federation of State, County & Municipal Employees v. AdvancePCS, et al*., Civil Action No. BC292227 (Cal. Super. Ct.) (the "AFSCME Litigation");

    d.    *In re Pharm. Indus. Avg. Wholesale Price Litig.*, 252 F.R.D. 83, 97 (D.Mass. 2008);

    e.    *New England Carpenters Health Benefits Fund v. First DataBank, Inc.*, No. 05-11148 (D. Mass. July 21, 2006)

I hereby declare, under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: September 6, 2013                    By: _____