UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| UNITED STATES OF AMERICA, ex rel. DAVID MORGAN,<br><br>    Plaintiff,<br><br>    v.<br><br>EXPRESS SCRIPTS, INC., et al.,<br><br>    Defendants. | No. 05-cv-01714 (DMC) (JAD)<br><br>Hon. Dennis M. Cavanaugh |

## DECLARATION OF DAVID S. STONE

I, David S. Stone, of full age, upon my oath declare as follows:

1. I am a member of the Bar of this Court and the Managing Partner in the law firm of Stone & Magnanini LLP ("SM"), attorneys for relator David Morgan, in the above-captioned matter. I submit this declaration in support of Relator's Opposition to the Motions to Dismiss Relator's Third Amended Complaint by Defendants First Databank, Inc. ("FDB") and Medi-Span.

2. In or around December 2004, before filing his original Complaint, Morgan disclosed in detail, the drug pricing fraud to the United States.

1

3. Morgan disclosed this information to Jim Sheehan, an Assistant U.S. Attorney in Philadelphia who at the time was one of the leading healthcare fraud prosecutors in the federal government.

4. Morgan prepared detailed factual analyses, charts, and disclosures for the federal government and engaged an expert to develop preliminary damages theories.

5. Morgan's disclosure included the fact that the Government was paying reimbursement claims for drugs based on the Average Wholesale Price ("AWP") published in FDB's *Blue Book*, which were 4.16% higher than the AWP published in Thomson's *Red Book* for nearly all brand name prescription drugs.

6. On or about January 18, 2005, Morgan also provided these disclosures to Deputy Chief U.S. Attorney Susan Steele and Assistant U.S. Attorney Stuart Minkowitz in the District of New Jersey.

7. Morgan's initial disclosures specifically called into question FDB's public statements that it calculates *Blue Book* drug prices by "surveying wholesalers in the marketplace." His initial disclosures pointed out that if FDB were actually surveying wholesalers, "the First Data Bank prices should be lower than the *Red Book* prices since it is well-documented that the manufacturers tend to publish average wholesale prices which are

        substantially above the prices they actually charge in the marketplace to wholesalers. . . ."

8. Morgan disclosed that it would be a "statistical impossibility, if FDB was actually doing surveys in the marketplace, that the prices of many of its drugs would turn out to be exactly 4.16% higher than *Red Book* on such a consistent basis."

9. Morgan provided the Government with a chart showing a consistent 4.16% mark up for the drugs Cipro (00026851351), Paxil (00029321120), Peg-Intron (00085127901), Singulair (00006011731), Wellbutrin (00173013555), Vioxx 25mg (00006011031), Patonol 0.1% 5ml (00065027105), Augmentin 400mg 100ml (00029609251), Combivent (00597001314), and Accupril 10mg (00071053023).

10. Morgan disclosed that this price inflation was the result of purposeful manipulation.

11. Morgan filed three complaints against FDB and the three Defendant PBMs in the District of New Jersey and the Eastern District of Pennsylvania on March 28 and 30, 2005, which were later consolidated in the District of New Jersey.

12. The Government's and Morgan's investigation of FDB led the Government to subpoena FDB on or about November 2, 2005.

13. In response to the Government's subpoena, Robert Hawley of Hearst Corporation (FDB's parent company) produced documents from at least fifteen FDB custodians on a rolling basis from December 20, 2005 through January 13, 2006, including documents relating to FDB's relationship with McKesson.

14. The documents also showed that McKesson influenced the published *Blue Book* AWP prices by providing FDB with inflated pricing information.

15. The documents showed that Robert James, a high-level brand manager at McKesson, provided Kay Morgan, an executive with FDB, inflated drug price information that McKesson and FDB knew to be the only information that FDB input into its database.

16. In furtherance of the Government's investigation, the Government interviewed FDB in or about October 2006. At that meeting, FDB admitted that it was not conducting wholesaler surveys and identified McKesson as a participant in its scheme.

17. The Government encouraged Morgan to amend his complaint to supplement his pleadings with additional factual details relating to FDB's scheme to inflate AWP, and to add defendants to his complaint, such as McKesson, that were liable participants in that fraud.

18.     Prior to filing the Second Amended Complaint, Morgan disclosed the substance of that complaint to the Government through numerous meetings and submissions.

I hereby certify that the above statements are true to the best of my knowledge. I understand that I am subject to punishment if any of the above statements are willfully false.

Dated:  September 6, 2013

   /s David S. Stone
David S. Stone