UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

---

UNITED STATES OF AMERICA, ex rel. DAVID MORGAN,

    Plaintiff,

    v.

EXPRESS SCRIPTS, INC., et al.,

    Defendants.

No. 05-cv-01714 (DMC) (JAD)

Hon. Dennis M. Cavanaugh

**DECLARATION OF DAVID S. STONE IN SUPPORT OF MOTION FOR RELATOR'S SHARE OF THE COMMONWEALTH OF VIRGINIA'S ALTERNATE REMEDY**

---

I, David S. Stone, of full age, upon my oath declare as follows:

1.    I am a member of the Bar of this Court and the Managing Partner in the law firm of Stone & Magnanini LLP ("SM" or the "Firm"), attorneys for relator David Morgan, in the above-captioned matter (the "Matter" or "Action"). I submit this declaration in support of Morgan's Motion for a Relator's Share of the Alternate Remedy Obtained by the Commonwealth of Virginia.

2.    I have continuously represented relator Morgan in connection with this Matter since 2004. In 2004, I represented Morgan as a partner of Boies Schiller & Flexner LLP ("BSF"). Starting in 2009, I represented Morgan

as a partner of SM (hereinafter referred to collectively with BSF as this "Firm").

3.  In or around December 2004, with the assistance of this Firm, Morgan disclosed to the federal government a massive fraud involving the fraudulent inflation of the average wholesale price ("AWP") of thousands of brand-name prescription drugs in First Data Bank's ("FDB's") *Blue Book*.

4.  In connection with that fraud, this Firm assisted Morgan in preparing and filing three complaints against FDB and certain other defendants, on behalf of the federal government and thirteen States, including the Commonwealth of Virginia, in the District of New Jersey and the Eastern District of Pennsylvania on March 28 and 30, 2005, which were later consolidated in the District of New Jersey.

5.  Morgan worked hand-in-hand with this Firm and the federal government to investigate the fraud, and through that investigation, Morgan and the federal government confirmed the fraudulent inflation of *Blue Book* AWPs and uncovered McKesson's role in conspiring with FDB to inflate those *Blue Book* AWPs.  Morgan requested leave to file a Second Amended Complaint on November 30, 2006, which added factual

support to his fraud claims and named McKesson as a jointly and

severally liable co-defendant (CM/ECF No. 9). The request was granted.

6.  Morgan and this Firm continued to assist the federal government with its

investigation into Morgan's claims against McKesson by drafting

subpoenas, analyzing e-mails and other documents, identifying witnesses,

preparing damages analyses, and making presentations about liability and

damages.

7.  Morgan and this Firm also provided the States with access to Morgan's

confidential and proprietary data and expertise in order to persuade the

States to form a team of National Medicaid Fraud Control Units

("NAMFCU") to pursue McKesson.

8.  The Commonwealth of Virginia became involved in Morgan's *qui tam*

suit very early on and remained actively involved until June 2011. AAG

Erica Bailey and AAG Lelia Beck worked closely with Morgan and this

Firm to develop Morgan's claims on behalf of Virginia. Between July

and October 2007, Morgan and this Firm participated in numerous

telephone conferences with AAG Bailey and provided AAG Bailey with

memoranda, key documents, and additional information regarding

Morgan's methodologies and analyses.

9.      Specifically, in or about the Summer of 2007, the Office of the Attorney

General for the Commonwealth of Virginia ("Virginia AG's Office")

requested Morgan's assistance to review Virginia's Medicaid

reimbursement claims and develop a damages estimate.

10.     Morgan ran Virginia's Medicaid reimbursement claims through his

proprietary algorithm on a claim-by-claim basis and identified

18,169,588 claims which had a markup of between 3.9% and 4.3%.

Morgan also identified $55,642,203 in damages to Virginia from an FDB

pricing practice pertaining to discontinued national drug codes.

11.     Morgan, through this Firm, provided Virginia with a report regarding his

estimated damages for Virginia, which included supporting spreadsheets

and methodologies.  A true and correct copy of the report is annexed as

Exhibit A.

12.     On or about June 3, 2011, Virginia filed a notice of non-intervention in

this Action under the Virginia Fraud Against Tax Payer's Act

("VFATA"), permitting Relator to pursue the case on its behalf

(CM/ECF No. 21).

13.     On June 8, 2011, Virginia filed its own lawsuit against McKesson under

VFATA in the Northern District of California, *The Commonwealth of

Virginia v. McKesson Corp.*, Case No. 3:11-cv-02782-SI (N.D. Cal.)

4

(hereinafter the "California Action"). Virginia did not notify this Firm or this Court about the California Action.

14. After learning of the California Action, this Firm contacted the Virginia AG's Office to notify Virginia of Morgan's rights under VFATA. Further, this Firm unsuccessfully attempted to arrange a meeting with the Honorable Kenneth T. Cuccinelli, II, Attorney General for the State of Virginia.

15. On or about April 27, 2012, the federal government announced that it reached a settlement with McKesson for $190 million. That settlement resolved all of Morgan's claims against McKesson on behalf of the federal government.

16. On or about July 26, 2012, NAMFCU announced that participating states reached a settlement with McKesson for over $151 million. Subsequently, with the addition of more States, that settlement grew to approximately $175 million. That settlement resolved all of Morgan's claims against McKesson on behalf of the fifteen participating States.

17. Virginia opted out of NAMFCU's settlement in order to pursue a larger settlement of Morgan's claims. Virginia did not move to dismiss Morgan's claims on Virginia's behalf, so those claims were still pending following the NAMFCU settlement.

18.  On or about October 18, 2013, Virginia reached a $37 million settlement of its claims against McKesson without notifying this Court or Morgan. In a press release issued by Virginia, Attorney General Cuccinelli expressly acknowledged that the California Action was an AWP case and compared the settlement obtained in that case to the one obtained in Morgan's *qui tam*.  A true and correct copy of the press statement issued by Attorney General Cuccinelli is annexed as Exhibit B.

19.  On or about October 22, 2013, this Firm sent a letter to the Virginia AG's Office, once again alerting Virginia to Morgan's rights to a relator share of the Virginia settlement with McKesson under VFATA.  A true and correct copy is annexed as Exhibit C.   To date, this Firm has not received a response from Virginia.

20.  To date, this Court's docket reflects that Virginia remains an interested party in this Action.  (Civ. No. 2:05-cv-01714-DMC-JAD).

I hereby certify that the above statements are true to the best of my knowledge.  I understand that I am subject to punishment if any of the above statements are willfully false.

Dated:  October 29, 2013

/s/ David S. Stone
David S. Stone

# EXHIBIT A



# MORGAN
### HEALTHCARE AUDITS, LLC

3544 N. Progress Avenue, Suite 102 | Harrisburg, PA 17110
Ph 717.540.0852 | Fx 717.540.0860 | www.healthcareaudits.com

Virginia Office of Attorney General

Re: Virginia Medicaid

Mr. Stone,

We have re-priced the VA Medicaid claims submitted to MHA by the VA OAG. As stated previously, the conversion was a bit of a challenge due to the poor quality of the claims data.

MHA identified 18,169,588 claims associated with the WAC +20% to WAC +25% pricing scheme that First Databank has admitted to have perpetrated. That translates into $442,485,223 in AWP spread between FDB and RB for VA Medicaid drug claims. (See the EXCEL spreadsheet provided with this document: TAB "Spread between 3.9 and 4.3".

There were 2,376,586 claims that had a percentage spread between FDB and RB outside the 3.9% to 4.3% spread used in the scenario identified above. Further investigation turned up another FDB pricing practice that may constitute another QuiTam. Refer to the Excel spreadsheet TABs labeled " Spreads outside the 4.16 param." And "Example of Obsolete Pricing" for the effect on VA Medicaid Claims.

The short version is that when a manufacture discontinued an NDC and that drug became Obsolete on the FDB and RB pricing file, Redbook stopped applying price updates, since the manufacture no longer was providing updates under the old NDC. Once the drug record was marked as Obsolete, the RB price never changed. FDB on the other hand cross-referenced the old NDC to the new drug record (updated NDC) and continued to apply the price increases for the new NDC to the Obsolete drug record. This practice caused a spread between the prices for the obsolete NDC numbers between the FDB and RB pricing files that continued to grow as time moved forward. In the case of VA OAG this practice created a spread of $56,642,203. (in addition to the 4.16% scheme).

Should you have any questions, please call or email.

Best regards,

David P. Morgan

Spread between 3.9 and 4.3

| Total Claims | FDB AWP EXTENDED | RB AWP EXTENDED | FDB REDBOOK PRICE DIFFERENCE | Average % Markup | INGREDIENT COST | AMOUNT BILLED | Comments |
|---|---|---|---|---|---|---|---|
| 18,169,588 | $11,061,979,711.11 | $10,619,494,467.84 | $442,485,223.27 | 4.17% | $2,122,483,438.02 | $1,457,793,970.31 | These were the claims that had a FDB/RB spread between 3.9% and 4.3% that can be attributed to the WAC +20% to WAC +25% pricing |

Morgan Healthcare Audits Confidential

9/24/2007

Spreads outside the 4.16 param.

| Total Claims | FDB AWP EXTENDED | RB AWP EXTENDED | FDB REDBOOK PRICE DIFFERENCE | Average % Markup | INGREDIENT COST 1 | AMOUNT BILLED | Comments |
|---|---|---|---|---|---|---|---|
| **Between 0 and 10% Difference** | | | | | | | |
| 1,916,275 | $ 128,985,639 | $ 125,675,362 | $ 3,310,278 | 2.57% | $ 79,959,975 | $ 57,396,380 | Eli Lilley Products* |
| **Greater than 10 and less than 20% Difference** | | | | | | | |
| 197,847 | $ 58,423,601 | $ 50,555,140 | $ 7,868,461 | 13.47% | $ 34,216,287 | $ 16,453,072 | Lilley, Squibb and Roche Products* |
| **Greater than 20 and less than 30% Difference** | | | | | | | |
| 85,680 | $ 39,222,761 | $ 31,708,208 | $ 7,514,552 | 19.16% | $ 18,090,313 | $ 14,514,825 | Lilley and Squibb Products* |
| **Greater than 30% Difference** | | | | | | | |
| 176,784 | $ 45,200,885 | $ 7,251,973 | $ 37,948,912 | 83.96% | $ 16,412,456 | $ 5,035,738 | Package Size Differences and Obsolete Drug Pricing |
| **Totals** | | | | | | | |
| 2,376,586 | $ 271,832,886 | $ 215,190,683 | $ 56,642,203 | 20.84% | $ 148,679,031 | $ 93,400,015 | |

* These FDB/RB spreads were caused by another questionable practice of FDB. See the TAB labeled "Examples of Obsolete Pricing" for an explanation of how this happened.

Morgan Healthcare Audits Confidential

9/24/2007

Morgan Healthcare Audits Confidential

## Example of Obsolete Pricing

| GCN Seq # | NDC | Label Name | Package Size | Manufacturer | AWP Unit Price | AWP Obsolete Date | AWP Begin Date |
|---|---|---|---|---|---|---|---|
| 9326 | 0002312542 | VANCOCIN HCL 125 MG PULVULE | 20 | VIROPHARMA INCO | 4.72500 | 07/14/2005 | 14-Jul-86 |
| 9326 | 0002312542 | VANCOCIN HCL 125 MG PULVULE | 20 | VIROPHARMA INCO | 5.12200 | 07/14/2005 | 26-Mar-96 |
| 9326 | 0002312542 | VANCOCIN HCL 125 MG PULVULE | 20 | VIROPHARMA INCO | 5.37800 | 07/14/2005 | 05-Jun-97 |
| 9326 | 0002312542 | VANCOCIN HCL 125 MG PULVULE | 20 | VIROPHARMA INCO | 5.59320 | 07/14/2005 | 21-Nov-00 |
| 9326 | 0002312542 | VANCOCIN HCL 125 MG PULVULE | 20 | VIROPHARMA INCO | 5.59300 | 07/14/2005 | 15-May-01 |
| 9326 | 0002312542 | VANCOCIN HCL 125 MG PULVULE | 20 | VIROPHARMA INCO | 6.43200 | 07/14/2005 | 28-Sep-01 |
| 9326 | 0002312542 | VANCOCIN HCL 125 MG PULVULE | 20 | VIROPHARMA INCO | 7.06260 | 07/14/2005 | 04-May-02 |
| 9326 | 0002312542 | VANCOCIN HCL 125 MG PULVULE | 20 | VIROPHARMA INCO | 8.01900 | 07/14/2005 | 23-Dec-03 |
| 9326 | 0002312542 | VANCOCIN HCL 125 MG PULVULE | 20 | VIROPHARMA INCO | 9.58060 | 07/14/2005 | 02-Dec-04 |
| 9326 | 0002312542 | VANCOCIN HCL 125 MG PULVULE | 20 | VIROPHARMA INCO | 12.23500 | 07/14/2005 | 31-Mar-05 |
| 9326 | 6659312502 | VANCOCIN HCL 125 MG PULVULE | 20 | VIROPHARMA INCO | 12.23500 | | 14-Jul-05 |
| 9326 | 0002312542 | VANCOCIN HCL 125 MG PULVULE | 20 | VIROPHARMA INCO | 15.13150 | 07/14/2005 | 16-Aug-05 |
| 9326 | 6659312502 | VANCOCIN HCL 125 MG PULVULE | 20 | VIROPHARMA INCO | 15.13150 | | 16-Aug-05 |
| 9326 | 6659312502 | VANCOCIN HCL 125 MG PULVULE | 20 | VIROPHARMA INCO | 16.1600 | | 24-Feb-06 |
| 9326 | 0002312542 | VANCOCIN HCL 125 MG PULVULE | 20 | VIROPHARMA INCO | 16.1600 | 07/14/2005 | 24-Feb-06 |
| 9326 | 6659312502 | VANCOCIN HCL 125 MG PULVULE | 20 | VIROPHARMA INCO | 7.67900 | | 16-Jan-07 |
| 9326 | 6659312502 | VANCOCIN HCL 125 MG PULVULE | 20 | VIROPHARMA INCO | 17.67900 | | 16-Jan-07 |
| 9326 | 0002312542 | VANCOCIN HCL 125 MG PULVULE | 20 | VIROPHARMA INCO | 17.67900 | 07/14/2005 | 16-Jan-07 |

When NDC 0002312542 went obsolete on 7/15/2005, FDB continued to apply price updates by cross referencing it with the NDC that replaced it, 6659312502. Redbook on the other hand kept the price where it was on the date the drug went obsolete. New claims for the drug, now distributed under a new NDC, would only get the increased price if the pharmacy submitted under the new NDC. Why were potentially obsolete drugs being dispensed and why was the pharmacy rewarded for keeping old stock on hand?  David P. Morgan BS Pharm

# EXHIBIT B

Case 2:05-cv-01714-MCA-MAH   Document 187-2   Filed 10/29/13   Page 13 of 19 PageID: 5986



*Commonwealth of Virginia*
*Office of the Attorney General*

Kenneth T. Cuccinelli, II
Attorney General

900 East Main Street
Richmond, Virginia 23219

**For media inquiries only, contact:** Brian J. Gottstein
**Email: bgottstein@oag.state.va.us** (best contact method)
**Phone:** 804-786-5874

# Cuccinelli announces $37 million Virginia Medicaid fraud settlement with McKesson Corp. for inflating prices of 400+ drugs

**RICHMOND (October 18, 2013) -** Attorney General Ken Cuccinelli announced today that Virginia will receive $37 million as part of a settlement his office negotiated with McKesson Corporation, one of the largest pharmaceutical wholesalers in the country, over allegations the company violated the Virginia Fraud Against Taxpayers Act by conspiring to inflate prices for more than 400 brand-named prescription drugs.

The attorney general alleged that McKesson conspired to inflate published Average Wholesale Price (AWP) information, causing Virginia's Medicaid program to overpay for those drugs. The Virginia Department of Medical Assistance Services (DMAS) uses the published AWP data to set Medicaid reimbursement rates for pharmaceuticals.

Virginia's $37 million settlement represents the largest recovery by any state Medicaid Fraud Control Unit (MFCU) against McKesson in this AWP case. In a previous settlement, which Virginia refused to join, 29 states, including California and New York, shared a total recovery of $151 million.

"This $37 million recovery shows that we will not tolerate Medicaid fraud in Virginia," said Cuccinelli. "It robs the taxpayers and it robs money needed for medical services for the poor. Our office refused to participate in a national settlement led by the Department of Justice because we needed to send a message that Virginia will fight to protect its Medicaid program from fraud and because the original settlement didn't cover the total loss to our Medicaid program.

"Our Medicaid Fraud Control Unit, working with the Virginia Department of Medical Assistance Services, was willing to go to trial in McKesson's hometown of San Francisco to get the maximum possible recovery we could in this case. Due to these efforts, we estimate that this $37 million recovery represents approximately ten times what other states that had a comparable impact to their Medicaid programs received from the previous, multistate settlement."

The settlement will return in excess of $30 million to the commonwealth's General Fund Health Care account within the next two weeks. $16.8 million is for compensatory damages for the state's Medicaid program, while $13.5 million is for penalties. This agreement resolves the case as to the Virginia state portion of Medicaid and imposes significant penalties upon McKesson Corporation for the alleged conduct.

http://www.oag.state.va.us/Media...   http://www.oag.state.va.us/Media...   10/22/2013

"Combating Medicaid fraud has been a focus of my administration for the past three and a half years," Cuccinelli said. "When I took office, I made expanding our Medicaid fraud unit a priority precisely to achieve this type of result."

With this recovery, the office has returned more money to the General Fund during Cuccinelli 's tenure than has been allocated by the General Assembly to fund the office. From 2010-2013, the General Fund budget for the office was approximately $78 million. The Medicaid fraud unit alone has returned $67.7 million to the General Fund during that same time. Additionally, the Consumer Protection Section, which handles fraud not related to Medicaid, has returned $73 million to the General Fund. And through annual budget savings, Cuccinelli has returned $3.2 million from his budget to the General Fund over the last four years.

Virginia MFCU's recoveries in last three and a half years now total $1.6 billion - more than all other recoveries combined since MFCU began 30 years ago. This amount includes money recovered not only for Virginia, but for the federal Medicaid program and other states.

The  case was brought by Virginia's MFCU in the U.S. District Court for the Northern District of California, McKesson Corporation's home district. Assistant attorneys general William Clay Garrett, Patrick A. McDade, Adele M. Neiburg, Joseph S. Hall, Lisa H. Shin, Jessica M. Smith, Kimberly M. Bolton, and Pierce C. Acuff represented the commonwealth. The attorney general would also like to recognize many of his MFCU investigators and paralegals who worked on various aspects of the case.  The entire team reviewed more than three million pages of documents in the discovery phase of the litigation.

The commonwealth also retained the services of Hagens Berman Sobol Shapiro LLP to assist as local counsel in the matter. The Virginia Department of Medical Assistance Services assisted in the development of the case, especially helping with evidence discovery.

**More about Attorney General Cuccinelli**

**Photos of the attorney general**

**A copy of this news release may be found on the attorney general's web site here.**



### #

# EXHIBIT C

# STONE ▇▇ MAGNANINI
## LLP

### COMPLEX COMMERCIAL LITIGATION

**NEW JERSEY OFFICES**   150 JFK Parkway, Short Hills, NJ 07078    P 973.218.1111    F 973.218.1106

October 22, 2013

**VIA FEDERAL EXPRESS**

Hon. Kenneth T. Cuccinelli, II
Attorney General of Virginia
Office of the Attorney General
900 East Main Street
Richmond, VA 23219

> Re:   *The Commonwealth of Virginia v. McKesson Corp.*
> Case No. 3:11-cv-02782-SI (N.D. Cal.)
> *United States ex rel. David Morgan v. McKesson Corp.*
> Case No. 04-cv-4265 (D.N.J.)
> Relator's Entitlement to Relator Share of Settlement Proceeds

Dear Attorney General Cuccinelli:

This letter is to follow up with the Commonwealth of Virginia on our conversations with both Your Honor and other representatives of your office over the past two years concerning Virginia's election to pursue an alternate remedy. As we believe you are aware from Your Honor's conversations with Eric Jaso (a former partner at Stone & Magnanini), we represent Plaintiff/Relator David Morgan in *United States ex rel. David Morgan v. McKesson Corp.*, Case No. 05-cv-1714 (D.N.J.), a federal *qui tam* case in which our client brought allegations of fraud in the reporting of Average Wholesale Prices for thousands of brand-name pharmaceuticals against wholesaler McKesson Corp. and other entities. The original Complaint, filed on March 28, 2005, was filed by Relator David Morgan on behalf of the United States of America and 13 states, including the Commonwealth of Virginia.

The Complaint and Relator Morgan's disclosures to Virginia put Virginia on notice of First Databank, Inc's ("FDB") fraudulent inflation of average wholesale price ("AWP"), and, moreover, they put Virginia on notice of the fact that wholesalers such as McKesson could very well be involved in FDB's fraudulent scheme because, as Morgan alleged in his disclosures and complaints, FDB's Blue Book prices were not, in fact, based on actual surveys of wholesalers, and those wholesalers must have known Blue Book prices did not reflect actual surveys. The Complaint was amended on November 30, 2006 to add McKesson Corp. as a named defendant. Very early on, we worked closely with the Virginia Attorney General's Office, specifically Lelia

Hon. Kenneth T. Cuccinelli, II
October 22, 2013
Page 2

Beck and Erica Bailey, to assist with the investigation and its analysis of damages.  For example, not only did we have in person meetings with AAG Bailey and other government attorneys, on October 23, 2007, April 29, 2008, May 13, 2008, February 19, 2009, May 27, 2009, and June 25, 2009, exchanged numerous emails and countless phone conversations in which the Attorney General's Office was deeply engaged and requesting updates and information, Relator Morgan assisted AAG Bailey, in or about the Summer of 2007, by painstakingly reviewing Virginia's Medicaid reimbursement claims in order to develop a damages estimate.  Using his proprietary algorithm, Relator Morgan identified 18,169,588 claims that exhibited a mark-up of AWP between 3.9 and 4.3%.  Relator Morgan determined that $77,032,677 was a conservative damages amount for the fraudulent AWP spread and he further identified an additional $55,642,203 in damages to Virginia resulting from an FDB pricing practice pertaining to discontinued NDCs.

In 2012, the United States and various States settled those claims against McKesson for a total of approximately $340 million, of which $151 million went to the participating States.  *See* Timothy W. Martin, *McKesson to pay $151 Million to Settle Drug-Pricing Suit*, The Wall Street Journal, July 27, 2012.  As part of that settlement, the States agreed that Relator Morgan was entitled to receive a share of the proceeds pursuant to their respective False Claims Acts.

Previously, on June 3, 2011, Virginia issued its Notice of Non-Intervention in Relator Morgan's action.  Virginia was one of several States that essentially "opted out" of the above-referenced State settlement in this action, which was obtained by a team from the National Association of Medicaid Fraud Control Units ("NAMFCU"), and instead, on June 8, 2011, filed its own lawsuit in the Northern District of California, *The Commonwealth of Virginia v. McKesson Corp.*, Case No. 3:11-cv-02782-SI (N.D. Cal.) (hereinafter the "California Action").

In June of 2011, when this office was advised that Virginia was opting out of the *qui tam* action to pursue an alternate remedy, the undersigned contacted AAG Bailey, who had been deeply involved in the investigation of Relator Morgan's case.  At that time, we placed Virginia on notice that we viewed it as improper for Virginia to decline but not dismiss Relator Morgan's case and instead attempt to pursue the very same claims in a separate action.  We also made it clear that we reserved Relator Morgan's rights to seek a relator's share in such event.  Subsequent to this conversation we attempted, through our partner Eric Jaso (who discussed this matter with Your Honor), to set up a meeting to discuss and resolve this issue.  However, no such meeting ever occurred.

We note that if you had proceeded with Relator Morgan's *qui tam*, under Virginia Code § 8.01-216.7(A), Relator Morgan would be entitled to 15-25% of the proceeds of the action.  Given the fact that Virginia declined this case, under Virginia Code § 8.01-216.7(B), Relator Morgan is entitled to 25-30% of Virginia's recovery.  We have reviewed Virginia's pleadings in the California Action and it is clear that, in substance, Virginia's claims against McKesson are identical to the ones made previously by Relator Morgan in his *qui tam* case, which at the time remained Under Seal.

Hon. Kenneth T. Cuccinelli, II
October 22, 2013
Page 3

We also understand that on October 18, 2013, your office issued a press release announcing that Virginia entered into a $37 million settlement with McKesson Corp. for its claims in the California Action. *See* http://www.oag.state.va.us/Media%20and%20News %20Releases/News_Releases/Cuccinelli/101813_McKesson_Corp.html ("Attorney General Ken Cuccinelli announced today that Virginia will receive $37 million as part of a settlement his office negotiated with McKesson Corporation, one of the largest pharmaceutical wholesalers in the country, over allegations the company violated the Virginia Fraud Against Taxpayers Act by conspiring to inflate prices for more than 400 brand-named prescription drugs.").

The press release acknowledged the national settlement by the States of Relator Morgan's *qui tam* and described Virginia's decision not to join the NAMFCU settlement as a decision to seek relief for the same "AWP case" independently.

Virginia's $37 million settlement represents the largest recovery by any state Medicaid Fraud Control Unit (MFCU) against McKesson in this AWP case. In a previous settlement, which Virginia refused to join, 29 states, including California and New York, shared a total recovery of $151 million.

"This $37 million recovery shows that we will not tolerate Medicaid fraud in Virginia," said Cuccinelli. "It robs the taxpayers and it robs money needed for medical services for the poor. Our office refused to participate in a national settlement led by the Department of Justice because we needed to send a message that Virginia will fight to protect its Medicaid program from fraud and because the original settlement didn't cover the total loss to our Medicaid program.

*Id.* (emphasis added). It is clear that the California Action, which pursued Virginia's claims under its False Claims Act, was brought to remedy the claims alleged in Relator Morgan's *qui tam*.

While we recognize Virginia has the right to settle separately from other States with McKesson, we also wish to remind Virginia that Relator Morgan is entitled to an award of the settlement proceeds pursuant to Virginia Code § 8.01-216.6(H) and § 8.01-216.7. Virginia Code § 8.01-216.6(H) specifically provides that the Commonwealth may choose to pursue the claims on its own behalf through any alternate remedy, but "[i]f any such alternate remedy is pursued in another proceeding, the person initiating the action shall have the same rights in such proceeding as such person would have had if the action had continued under this section." Regardless of whether Virginia had participated in the NAMFCU settlement or achieved this settlement on its own, the settlement was of the claims brought to the Commonwealth of Virginia's attention by Relator Morgan through his *qui tam*, and Relator Morgan is entitled to his relator's share. As detailed above, we previously put Virginia on notice that Relator Morgan intended to maintain his rights to an alternate remedy and, by this letter, we reemphasize that notice. Accordingly, we presume Virginia intends to meet its obligation under Virginia Code § 8.01-216.6(H) and to pay Relator Morgan his fair relator's share.

Hon. Kenneth T. Cuccinelli, II
October 22, 2013
Page 4


     We look forward to discussing a fair resolution of Relator Morgan's share of the proceeds from Virginia's settlement.  Please do not hesitate to contact me at (973) 218-1111 or DStone@stonemagnalaw.com.


         Respectfully submitted,


         David S. Stone
         Counsel for Relator David Morgan


cc:    William Clay Garrett, Esq.
       Lelia Beck, Esq.
       Steve W. Berman, Esq.