NOT FOR PUBLICATION

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| UNITED STATES OF AMERICA; CALIFORNIA; DELAWARE; FLORIDA; GEORGIA; HAWAII; ILLINOIS; INDIANA; LOUISIANA; MASSACHUSETTS; MICHIGAN; MONTANA; NEVADA; NEW HAMPSHIRE; NEW JERSEY; NEW MEXICO; NEW YORK; OKLAHOMA; RHODE ISLAND; TENNESSEE; TEXAS; VIRGINIA; WISCONSIN; and the DISTRICT OF COLUMBIA, <br><br> *EX REL*. DAVID MORGAN, <br><br> Plaintiff/Relator, <br><br> v. <br><br> EXPRESS SCRIPTS, INC.; CVS CAREMARK CORPORATION; MEDCO HEALTH SOLUTIONS, INC.; FIRST DATABANK, INC.; WOLTERS KLUWER HEALTH d/b/a MEDI-SPAN; MCKESSON CORPORATION; CARDINAL HEALTH, INC.; AMERISOURCEBERGEN CORPPRATION.; and JOHN DOE CORPORATIONS 1-20, <br><br> Defendants. | **Hon. Dennis M. Cavanaugh** <br><br> **OPINION** <br><br> Civil Action No. 2:05-cv-1714 (DMC) (JAD) |

DENNIS M. CAVANAUGH, U.S.D.J.:

This matter comes before the Court upon six motions to dismiss the Third Amended

Complaint (the "TAC") of Plaintiff Relator David Morgan ("Plaintiff," "Relator," or "Morgan")

brought by (1) Express Scripts, Inc. ("ESI") and Medco Health Solutions, Inc. ("Medco") (April

1

16, 2013, ECF No. 147); (2) Wolter Kluwer Health, Inc. d/b/a Medi-Span ("Medi-Span") (April 16, 2013, ECF No. 148); (3)&(4) AmerisourceBergen Corporation ("ABC") (April 16, 2013, ECF Nos. 154, 161); (5) CVS Caremark Corporation ("Caremark") (April 16, 2013, ECF No. 159); and (6) First Databank, Inc. ("FDB") (April 16, 2013, ECF No. 160) pursuant to FED. R. CIV. P. 12(b)(1), FED. R. CIV. P. 12(b)(6) and FED. R. CIV. P 9(B). Pursuant to FED. R. CIV. P. 78, no oral argument was heard. Based on the following and for the reasons expressed herein, Defendants' Motions to Dismiss are **granted.**

## I.     BACKGROUND[1]

Relator David Morgan is a licensed pharmacist who also runs his own business conducting audits of Pharmacy Benefit Managers ("PBMs") for third-party payor clients. In the pharmaceutical industry, the list price for drugs sold to wholesalers by drug manufacturers is called the Wholesale Acquisition Cost ("WAC"). The list price for drugs sold to retail pharmacies by wholesalers in turn is called the Average Wholesale Price ("AWP"). As a general practice, third-party payors that pay or insure health benefits, including federal and state agencies that contract with PBMs, base their prescription drug reimbursements almost exclusively on the AWP. The AWP is published by three main sources: (1) FDB's "Blue Book"; (2) Thomson's "Red Book"; and (3) Medi-Span's "Drug Database."

In 2002, while auditing a private third-party payor's pharmacy claims processed by ESI, Relator discovered that Blue Book's AWP was consistently higher than the AWP listed by Red Book. During subsequent PBM audits, Relator found that the same consistent percentage disparity existed and had increased over time. After obtaining full data sets from Blue Book and Red Book for a multi-year period, Relator ran comprehensive analyses and found that for brand-

---

[1] The facts set forth in this Opinion are taken from the parties' respective moving papers and filings.

name drugs, the Blue Book AWP was consistently 4.16 % higher than Red Book.  Relator alleges he found no such differential for narcotics and other controlled substances, for which prescriptions are highly regulated and monitored by the Government.  Relator also asserts he found no AWP differential for highly advertised drugs such as Viagra and Claritin.

Relator filed this action against three different types of defendants (1) Wholesaler Defendants (McKesson, Cardinal Health, and ABC); (2) Publisher Defendants (FDB and Medi-span); and (3) PBM Defendants (ESI, Medco and Caremark).  In the TAC, Relator alleges that FDB (and, for a time Medi-Span, a subsidiary it later divested), at the urging of wholesaler McKesson, intentionally inflated Blue Book's published AWP over Red Book's AWP, creating a uniform "spread" between the two.  According to Relator, that intentional inflation of Blue Book AWP enabled retailers, wholesalers, and PBMs to profit by causing third-party payors, including the federal and state governments, to reimburse for prescription drugs at the higher Blue Book AWP rate.  Relator asserts that McKesson and FDB implemented and perpetrated this fraudulent scheme while publicly representing they maintained an arms-length relationship. According to Relator, FDB falsely represented that it performed sophisticated statistical surveys of actual prices charged by wholesalers in the marketplace and mathematically weighted the results of the data to arrive at its AWP.  Relying on FDB's reputation and alleged accurate and extensive data analysis, third-party payors, including federal and state governments, often required by contract or law that Blue Book data be used to calculate reimbursements.  However, according to the TAC, FDB was not actually conducting any formal mathematical or statistical surveys but was relying solely on data provided to it by McKesson.

Relator asserts that McKesson understood that by inflating the prices it provided to FDB, it could inflate the payment its pharmacy customers received from federal and state governments

3

as well as from other third-party payors, thus substantially boosting their profits. Accordingly, Relator alleges, McKesson went about systematically inflating AWP on thousands of prescription brand-name drugs by reporting the inflated prices to FDB. Relator asserts that FDB, McKesson and the other Wholesaler Defendants, including ABC, knew that as a result of the McKesson/FDB scheme, the benchmark used to pay drug claims by third-party payors, including the Government, had materially changed, yet they concealed this fact from their customers and the marketplace and exploited it to increase their own profits.

As for the PBM Defendants, Relator asserts that they exploited the McKesson/FDB scheme for their own benefit. According to Relator, after recognizing that Blue Book's reported AWP for many brand name drugs was approximately four percent higher than Red Book's, the PBM Defendants included the right to select Blue Book as the exclusive source for AWPs in their contracts with third-party payors so that they could capitalize on the discrepancy. The TAC asserts that the PBM Defendants were in a position to, and had a contractual and fiduciary duty to prevent the damage incurred by the Government as a result of the McKesson/FDB scheme but instead chose to remain silent and exploit the scheme to their pecuniary advantage.

In December 2004, Relator disclosed the details of the alleged scheme to the Government. Relator then filed his initial complaint on March 28, 2005 against ESI and FDB only. (ECF No. 1). Over a year later, Relator filed an Amended Complaint ("FAC") adding Caremark and Medco as Defendants (May 26, 2006, ECF No. 6). Relator then filed his Second Amended Complaint ("SAC") on November 30, 2006 and the TAC, over two years later, on January 26, 2009. (ECF Nos. 9, 16). Both the SAC and the TAC were brought against the complete list of Defendants: ESI, FDB, Caremark, Medco, Medi-span, McKesson, Cardinal Health and ABC. On June 6, 2012, the United States intervened and dismissed its case with

4

respect to McKesson but declined to intervene against any of the other defendants. Simultaneously, the Department of Justice announced that it had reached a settlement of the FCA claims against McKesson, in which McKesson would pay the United States over $190 million. On April 15, 2013, Relator and Cardinal Health stipulated to the dismissal of all claims against Cardinal Health.

Relator brings this action on behalf of himself and the United States pursuant to the False Claims Act, 31 U.S.C. § 3729 et seq. ("FCA"), and on behalf of himself and the Plaintiff States and the District of Columbia pursuant to their respective false claims acts. Overall, Relator alleges that the inflated and artificial Blue Book AWP caused millions of reimbursement claims to be submitted based on information that McKesson, FDB, the PBMs and other Defendants knew to be false. According to the TAC, billions in false claims for prescription drugs were submitted and paid and continue to be filed and paid with ever-increasing damage to the Government. Specifically, the TAC asserts thirty causes of action, including claims under the FCA (Counts One through Four) as well as the false claims acts of twenty-two states and the District of Columbia (Counts Eight through Thirty). Also, against the PBM Defendants only, Relator asserts causes of action based on the presentation of false claims arising from breach of contract, breach of the covenant of good faith and fair dealing, and breach of fiduciary duty. (Counts Five through Seven).

Defendants have moved to dismiss Relator's TAC on the grounds that the Court lacks jurisdiction because Relator's claims are prohibited by the FCA's Public Disclosure Bar and Relator is not an original source; the TAC does not satisfy the heightened pleading requirements for fraud claims of Fed. R. Civ. P. 9(b); and Relator has failed to state a claim pursuant to Fed. R. Civ. P. 12(b)(6). Defendants make the same arguments as to the state claims and argue that the

5

Court should decline to exercise supplemental jurisdiction over them because Relator's foundational federal claims lack merit and should be dismissed.

## II.     LEGAL STANDARD

### a.  Standard for Dismissal Pursuant to Fed. R. Civ. P. 12(b)(1)

When considering motions seeking dismissal for lack of jurisdiction pursuant to Fed. R. Civ. P. 12(b)(1), "no presumpti[on of] truthfulness attaches to a plaintiff's allegations." Martinez v. U.S. Post Office, 875 F. Supp. 1067, 1070 (D.N.J.1 995) (citing Mortensen v. First Fed. Sav. and Loan Ass'n, 549 F.2d 884, 891 (3d Cir. 1977)). "Accordingly, unlike a Rule 12(b)(6) motion, consideration of a Rule 12(b)(1) motion need not be limited; conflicting written and oral evidence may be considered and a court may 'decide for itself the factual issues which determine jurisdiction.'" Id. (citing Williamson v. Tucker, 645 F.2d 404, 413 (5th Cir.) cert. denied, 454 U.S. 897 (1981)). Nonetheless, "[w]here an attack on jurisdiction implicates the merits of plaintiff's federal cause of action, the district court's role in judging the facts may be more limited." Martinez, 875 F. Supp. at 1071 (citing Williamson, 645 F.2d at 413 n.6). Once a Fed. R. Civ. P. 12(b)(1) challenge is raised, the burden shifts and the plaintiff must demonstrate the existence of subject matter jurisdiction. PBGC v. White, 998 F.2d 1192, 1196 (3d Cir. 1993).

### b.  Standard for Dismissal Pursuant to Fed. R. Civ. P. 12(b)(6)

In deciding a motion under Rule 12(b)(6), a district court is "required to accept as true all factual allegations in the complaint and draw all inferences in the facts alleged in the light most favorable to the [Plaintiff]." Phillips v. Cnty. of Allegheny, 515 F.3d 224, 228 (3d Cir. 2008). "[A] complaint attacked by a . . . motion to dismiss does not need detailed factual allegations." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007). However, the Plaintiff's "obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and

a formulaic recitation of the elements of a cause of action will not do." Id. (internal citations omitted). "[A court is] not bound to accept as true a legal conclusion couched as a factual allegation." Papasan v. Allain, 478 U.S. 265, 286 (1986). Instead, assuming that the factual allegations in the complaint are true, those "[f]actual allegations must be enough to raise a right to relief above a speculative level." Twombly, 550 U.S. at 555.

"A complaint will survive a motion to dismiss if it contains sufficient factual matter to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009) (citing Twombly, 550 U.S. at 570). "A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for misconduct alleged." Id. "Determining whether the allegations in a complaint are 'plausible' is a 'context-specific task that requires the reviewing court to draw on its judicial experience and common sense." Young v. Speziale, Civ. No. 07-03129, 2009 WL 3806296, at *3 (D.N.J. Nov. 10, 2009) (quoting Iqbal, 129 S. Ct. at 1950). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged–but it has not 'shown'–that the pleader is entitled to relief." Iqbal, 129 S.Ct. at 1950.

### c. Satisfaction of Rule 9(b)

For a fraud-based claim, a court may grant a motion to dismiss pursuant to FED. R. CIV. P. Rule 9(b) if the plaintiff fails to plead with the required particularity. Plaintiffs must satisfy the heightened pleading requirements of Rule 9(b), which requires that "in all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." FED. R. CIV. P. 9(b). The heightened pleading standard gives defendants "notice of the claims against them, provides an increased measure of protection for their reputations, and reduces the number of frivolous suits brought solely to extract settlements." In re

Burlington Coat Factory Securities Litigation, 114 F.3d 1410, 1418 (3d Cir. 1996).  Essentially,

"[a] plaintiff must support allegations of fraud with all the essential factual background that

would accompany the first paragraph of any newspaper story – that is, the who, what, when,

where, and how of the events at issue." Hemy v. Perdue Farms, Inc., Civ. No. 11–888, 2011

WL 6002463, at *13 (D.N.J. Nov. 30, 2011) (internal citations omitted).

## III.   DISCUSSION

### a.  The FCA's Public Disclosure Bar

"In broad strokes, the FCA imposes penalties on persons who knowingly submit fraudulent

claims to the Government.  To encourage the ferreting out of fraud against the Government, the

FCA incentivizes private individuals aware of such fraud to bring [*qui tam*] civil actions as

relators . . . by allowing relators to collect a percentage of any recovery." United States ex rel.

Paranich v. Sorgnard, 396 F.3d 326, 332 (3d Cir. 2005).  However, the "jurisdictional bar" of the

FCA operates to exclude *qui tam* actions "based upon allegations of fraud or fraudulent

transactions that have been publicly disclosed" because such allegations would have been

"equally available to strangers to the fraud transaction had they chosen to look for it as it was to

the relator." See id.  The purpose of this is simple; the FCA seeks to prevent "*qui tam* actions in

which a relator, instead of plowing new ground, attempts to free-ride by merely repastinating

previously disclosed badges of fraud." See United States ex rel. Ondis v. City of Woonsocket,

587 F.3d 49, 53 (1st Cir. 2009).

The FCA's Public Disclosure Bar provides as follows:

No court shall have jurisdiction over an action under this section based upon the
public disclosure of allegations or transactions in a criminal, civil, or
administrative hearing, in a congressional, administrative or Government
Accounting Office report, hearing audit, or investigation, or from the news
media, unless the action is brought by the Attorney General or the person
bringing the action is an original source of the information.

31 U.S.C. § 3730(e)(4)(A) (1996) (the "Public Disclosure Bar").  Because the Public Disclosure Bar is jurisdictional, the burden rests on Relator to establish that this Court has subject-matter jurisdiction over the FCA Claims he asserts.  See, e.g., United States, ex rel. Gohil v. Aventis Pharms., Inc., 387 Fed. Appx. 143, 145 (3d Cir. 2010) (observing that Public Disclosure Bar is jurisdictional); see also Animal Sci. Prods., Inc. v. China Minmetals Corp., 654 F.3d 462 (3d Cir. 2011) ("[T]he burden in a Rule 12(b)(1) motion rests with the plaintiff, who must establish that there is subject matter jurisdiction.").  Moreover, "[s]tatutes such as the FCA which confer jurisdiction on federal courts are to be strictly construed, and doubts resolved against federal jurisdiction."  United States ex rel. Duxbury v. Ortho Biotech Prods., L.P., 551 F. Supp. 2d 100, 104 (D. Mass. 2008).

The Public Disclosure Bar applies where: (1) information was publicly disclosed via a source listed in § 3730(e)(4)(A); (2) the public disclosure included an "allegation or transaction" within the meaning of the statute; and (3) the complaint is "based upon" those disclosures. United States ex rel. Atkinson v. Pa. Shipbuilding Co., 473 F.3d 506, 519 (3d Cir. 2007).  By its plain terms, the Public Disclosure Bar covers "allegations . . . from the news media."  31 U.S.C. § 3730(e)(4)(A).  The statute also bars allegations filed as part of civil complaints.  See, e.g., Paranich, 396 F.3d at 334 (holding that "a complaint in a civil action falls into the context of 'criminal, civil, or administrative hearings' and is sufficiently public within the meaning of the [Public Disclosure Bar] to constitute a public disclosure").

In order to constitute "allegations or transactions" within the meaning of the Public Disclosure Bar, the public disclosure must either allege the actual fraud, or must allege both the misrepresented state of facts and the true state of facts such that an inference of fraud may be drawn.  Atkinson, 473 F.3d at 519.  In fact, public disclosure of the material elements of a fraud

claim has been found to be enough to bar a *qui tam* action even if the disclosure itself does not allege any wrongdoing. United States ex rel. Fine v. Sandia Corp., 70 F.3d 568, 572 (10th Cir. 1995); see also United States ex rel. Dingle v. BioPort Corp., 270 F. Supp. 2d 968, 977 n.1 (W.D. Mich. 2003), aff'd, 388 F.3d 209 (6th Cir. 2004).

The "based upon" component of the Public Disclosure Bar does not require that the publicly disclosed information be the actual and only basis of the relator's complaint. Rather, the relator's allegations "need only be 'supported by' or 'substantially similar to' the disclosed allegations and transactions." Atkinson, 473 F.3d at 519 (quoting United States ex rel. Mistick PBT v. Housing Auth., 186 F.3d 376, 385-88 (3d Cir. 1999)). Notably, the Third Circuit has expressly held that the phrase "based upon" does not mean "actually derived from," because such an interpretation would render the original source exception superfluous. Mistick, 186 F.3d at 385-88.

### b. Publisher and Wholesaler Defendants' Public Disclosure Bar Arguments

With respect to the Publisher and Wholesaler Defendants, Relator's allegations can be reduced to two general categories: 1) the AWP Inflation Allegations and 2) the McKesson Conspiracy Allegations. The AWP Inflation Allegations assert that FDB artificially inflated and reported AWPs that did not reflect an average of actual prices paid by retailers and were consistently 4.16% higher than the AWPs published in the Red Book. The McKesson Conspiracy Allegations assert that FDB and McKesson conspired to fraudulently inflate AWPs. These allegations include the contention that FDB failed to survey wholesalers other than McKesson to generate the AWP. Relator contends that Medi-span and ABC were complicit in this scheme. Defendants FDB, Medi-span and ABC assert that these claims are barred by the FCA's Public Disclosure Bar because the same information existed in the public realm in prior

filed litigations, congressional hearings and reports, and other reports issued by or submitted to the Federal Government since at least the 1990s.

Defendants argue that the alleged fraud regarding the AWP Inflation Allegations is "substantially similar" to prior disclosures made in congressional hearings and Office of Inspector General ("OIG") reports. Defendants point to a statement made in 1997 by the Principal Deputy Inspector General of the Department of Health and Human Services ("DHHS") during Congressional hearings on "Health Care Waste, Fraud, and Abuse" that Medicare overpaid for prescriptions because the "AWP…is easily manipulated and greatly inflated."[2] Among other statements and reports, Defendants also call attention to a 2004 congressional report entitled "Medicaid and Medicare Drug Pricing: Strategy to Determine Market Prices" which noted a shift resulting in most drug products of major drug manufacturers "moving their AWP from 20 percent to 25 percent above the WAC."[3]

Defendants also assert that the AWP Inflation Allegations are "substantially similar" to an AWP class action lawsuit filed in 2001, several years before Relator filed his original complaint. See In re Pharm. Indust. Average Wholesale Price Litig., 491 F. Supp. 2d. 20, 33 (D. Mass. 2007) (the "In re AWP Litigation"). In that case, a proposed national class of Medicare beneficiaries filed a federal lawsuit against drug manufacturers alleging that defendants and their "co-conspirators" engaged in a "fraudulent scheme" to "grossly inflate" the AWPs for Medicare

---

[2] *Health Care Waste, Fraud, and Abuse:* Hearing Before the Subcomm. on Health of the H.R. Comm. on Ways and Means, 105th Cong. 57 (1997). *See Also Patients First: A 21st Century Promise to Ensure Quality and Affordable Health Coverage:* Joint Hearings before the Subcomm. on Health and the Subcomm. on Oversight and Investigations of the H.R. Comm. on Energy and Commerce, 107th Cong. 269 (2001) (statement of Congressman James Greenwood)("it appears quite obvious that there is nothing average or wholesale about [the AWP] and it is based on absolutely nothing, it is a fiction.")
[3] *Medicaid Prescription Drug Reimbursement: Why the Government Pays Too Much*: Hearings before the Subcomm. on Oversight and Investigations of the H.R. Comm. on Energy and Commerce, 108th Cong. 12, 13-71 (2004)

covered drugs."[4]  The complaint alleged that the published AWPs typically reflected a 20% to 25% markup from the WAC.  Defendants point out that the percentage difference between a 20% and 25% markup will always be 4.16%, the differential alleged by Relator.  On July 28, 2003, almost two years before Relator filed his original complaint, plaintiffs filed an Amended Master Consolidated Class Action Complaint alleging that three publishers, including FDB, conspired with the defendants to fraudulently inflate published AWPs used as a basis for Medicare and Medicaid reimbursements.[5]  On February 24, 2005 plaintiffs added Medi-span as a defendant.[6]

As for the McKesson Conspiracy Allegations, Defendants assert that these are "substantially similar" if not identical to the allegations of a McKesson/FDB conspiracy first raised in <u>New England Carpenters Health Benefits Fund et al. v. First Databank, Inc. et al.</u>, No. 1:05-cv-11148-PBS (D. Mass 2005) (the "<u>NEC</u> Litigation").  On June 2, 2005, a national class of "consumers, self-insured employers, health and welfare plans, health insurers and other end payors of prescription drugs" filed a complaint against McKesson and FDB alleging that they perpetrated a fraudulent scheme to inflate the AWPs published by FDB, "causing members of the proposed class, whose payments for pharmaceuticals are tied to AWP, to make billions of dollars in excess payments for those pharmaceuticals."[7]  On October 6, 2006, the Wall Street Journal published a front page article recounting the allegations in the <u>NEC</u> Litigation, including the plaintiffs' claim that FBD got its AWP data solely from McKesson and did not survey other wholesalers.[8]  Defendants point out that it was not until November 30, 2006, over a year after the

---

[4] Class Action Complaint, *In re Pharm. Indust. AWP Litig.*, Civ. No. 1:01-cv-12257-PBS, MDL No. 1465 (D. Mass. Dec. 19, 2001).

[5] Amended Master Consolidated Class Action Complaint, *In re Pharm. Indust. AWP Litig.*, Civ. No. 1:01-cv-12257-PBS, MDL No. 1465 (D. Mass. July 28, 2003) ¶¶ 619-628.

[6] Second Amended Master Consolidated Class Action Complaint, *In re Pharm. Indust. AWP Litig.*, Civ. No. 1:01-cv-12257-PBS, MDL No. 1465 (D. Mass. July 28, 2003) ¶¶ 622, 626.

[7] Complaint, *New England Carpenters Health Benefits Fund, et. al., v. First Databank, Inc. and McKesson Corp.*, Civ. No. 05-11148 (D. Mass. June 2, 2005).

[8] Barbara Martinez, *How Quiet Moves by a Publisher Sway Billions in Drug Spending*, WALL ST. J., Oct. 6, 2006.

NEC Litigation began and a month after the Wall Street Journal article appeared that Relator filed his SAC adding McKesson, Medi-Span, Cardinal Health and ABC as Defendants. Defendants assert that the SAC's allegations of a conspiracy between FDB and McKesson to "bump-up" the AWP markup from 20% to 25% and the alleged lack of wholesaler surveys to support FDB's published AWPs are essentially identical to and potentially extracted directly from the complaint submitted in the NEC Litigation.

Even before the 2006 Wall Street Journal article mentioned above, Defendants assert that the news media reported extensively about the inflation of AWPs, including the 20% to 25% range of AWP inflation and the financial incentives that wholesalers and other industry members had to inflate the AWP. As early as 2002, for example, newspaper articles reported that AWP was "neither average nor wholesale" and was commonly known as "Ain't What's Paid."[9] In October 2006, several sources, including industry publications, disclosed the same five percent bump in AWP (from 20% to 25% over WAC) that Relator alleges here.[10] In October 2006, before Relator filed the SAC, the news media also reported that First Databank and McKesson had conspired to inflate AWPs.[11]

### c. Pharmacy Benefit Manager Public Disclosure Bar Arguments

The allegations against the PBM Defendants, ESI, Medco and Caremark, are slightly different. Relator alleges that the PBM Defendants violated the FCA by failing to tell the

---

[9] See Steve Bailey, *Profits v. People*, BOSTON GLOBE, Apr. 10, 2002; Bill Brubaker, *Firms in Talks on Overbilling for Medicare, Medicaid Drugs*, WASHINGTON POST, May 11, 2000.

[10] See *Managed Care Pharmacists to Review Payment Methods*, INSIDE CMS, Nov. 2, 2006 (detailing allegations of 25% bump); Theresa Agovino, *Publisher Agrees to Stop Printing List of Drug Prices*, MEMPHIS COMMERCIAL APPEAL, Oct. 8, 2006 ("McKesson and First Databank increased the spread from 20 percent to 25 percent on hundreds of drugs."); *First Databank Agrees to Settle Price Fixing Suit*, PHARMA MARKETLETTER, Oct. 16, 2006 (stating that First Databank "raised from 20% to 25% the mark-ups wholesalers were making on their drug sales").

[11] See *Class Action Suit Against Drug Giants May Accelerate AWP Demise*, INSIDE CMS, Nov. 16, 2006 ("The [plaintiffs] had accused First Databank of conspiring with McKesson Corp., a wholesaler, to maximize profits by arbitrarily inflating the price 'spread' between AWP and the wholesale acquisition cost, a rate wholesalers often use when selling drugs to pharmacies.").

Government everything it knew about the inflated AWP, and by pocketing secret pricing "spreads" between the prices they paid to pharmacies for prescription drugs and the prices they received from government insurance plans as reimbursement for those same drugs. According to the PBM Defendants, Relators allegations merely parrot more than a dozen complaints filed in lawsuits predating his complaint by as much as three years. ESI and Medco (the "ESI Defendants") assert that when Morgan filed his lawsuit on March 28, 2005, the ESI Defendants had been sued in federal and state courts on at least fourteen occasions by plaintiffs accusing them of substantially similar, if not the very same, wrongdoing alleged by Relator.

The ESI defendants point to numerous lawsuits filed in the three years before Relator filed his complaint accusing them of profiting fraudulently from their secret knowledge of AWPs and the creation of clandestine pricing "spreads." As a result of the numerous law suits filed between 2002 and 2005, a multidistrict litigation styled In Re Express Scripts, Inc., Pharmacy Benefits Management Litigation ("the ESI MDL") was established to consolidate the pretrial proceedings in the United States District Court for the Eastern District of Missouri. CA No. 4:05-md-01672-HEA (E.D. Mo. Filed April 29, 2005). The ESI Defendants point to the allegations in Fidelity Insurance Co., et al. v. Express Scripts, Inc., et al., Civil Action No. 03cv1240 (Montgomery County, Maryland) (later removed to federal court and transferred to the Eastern District of Missouri) (the "Fidelity Litigation"); Brown, et al. v. Express Scripts, Inc., Civil Action No. 3:04-cv-01822-AWT (D. Conn) (alleging that ESI "knew or should have known that First Databank's [Blue Book] pricing was inflated" and created a "secret differential or 'spread' between the price it pays, using the Fund's assets, to the retail pharmacy and the price it then charges and collects from the Fund.") (the "Brown Litigation"); American Federation of State, County & Municipal Employees v. AdvancePCS, et. al., Civil Action No. BC292227 (Cal.

Super. Ct.) (alleging that ESI and Medco committed unfair and deceptive acts by fraudulently

concealing their knowledge that published AWPs were inflated so that they could create and

pocket a pricing "spread") (the "<u>AFSCME</u> Litigation"); <u>Hot Spring County Solid Waste</u>

<u>Authority v. Hatcher Enterprises, Inc., et al.</u>, Case No. CV-20040135-1 (Ark. Cir. Ct. June 28,

2004) (alleging that Medco used inflated AWPs as the basis for reimbursement and pockets a

spread between charges paid to pharmacies and collected from clients) (the "<u>Hot Springs</u>

Litigation") as well as ten other complaints alleging the ESI Defendants used inflated AWPs or

secret spreads.

In the <u>Fidelity</u> Litigation, the plaintiffs alleged that ESI "knew or should have known that

First Databank's [Blue Book AWP] pricing was inflated and thus did not represent the lowest

possible AWP price available in the market."  Second Am. Comp., <u>Fidelity</u> Litigation, Dkt. No.

80 ¶ 108.  The Fidelity plaintiffs also alleged that ESI created a secret spread "between the price

ESI received from Fidelity for brand name-prescriptions and the price ESI paid to participating

retail pharmacies using Fidelity's funds for those prescriptions that was kept for itself."  <u>Id.</u> at ¶¶

93, 97, 148.  The ESI Defendants also assert that the <u>Fidelity</u> litigation is significant because

Morgan was retained as a consultant as early as 2002 and later as an expert by Fidelity Insurance

Group in that case.  According to the ESI Defendants, it is through the public information

released in connection with that case that Morgan obtained the information upon which he bases

his allegations and not independently as he asserts.

The ESI Defendants also point to numerous public disclosures in the media prior to

March 2005 of the allegations underlying Morgan's Complaint.  In 2003, the Wall Street Journal

published an article entitled "Pharmacy Benefit Firms Profit on Generic Drugs" quoting industry

observers as stating that it is "an open secret in the industry that AWPs often are severely

15

inflated" and that PBMs attempted to "take advantage of the 'spread' between pharmacy prices and what corporate and government clients pay."[12]  Similarly, a 2003 New York Daily News article details investigations into the ESI Defendants' use of AWP as a pricing benchmark and spread pricing, and also contains acknowledgments by each Defendant that clients are unaware of spread-pricing profits.[13]

### d.  Relator's Response to Public Disclosure Bar Arguments

Plaintiff responds that in December 2004, when Relator first disclosed the scheme to the Government, there were no public allegations of the specific fraud Relator asserts against FDB and the other Defendants.  Plaintiff concedes that federal and state governments conducted investigations into the alleged manipulation of AWP in the 1990s.  However, Plaintiff asserts that these investigations had to do with manipulation by drug manufacturers, not wholesalers, and inflated AWPs published in Red Book, not Blue Book.  Plaintiff contends that as a result of these investigations FDB agreed to change its mechanism for calculating AWP by surveying drug wholesalers instead of manufacturers.  According to Plaintiff, by touting the accuracy of these wholesaler surveys, FDB induced government programs to rely on Blue Book AWPs in making drug reimbursements.  It is this fraud, not the prior manufacturer-based AWP inflation in Red Book, that Plaintiff asserts is the basis for its claims.

---

[12] Barbara Martinez, *Pharmacy-Benefit Firms Profit on Generic Drugs*, WALL ST. J., Mar. 31, 2003.

[13] *See* William Sherman, *RX Ripoffs Hard to Swallow: State Probing Drug Pricing and Sales Tactics*, N.Y. DAILY NEWS, Jul. 27, 2003.  *See also Pharmacy Benefit Managers Charged with Inflating*, PR NEWSWIRE, Mar. 18, 2003 ("[Express Scripts and Medco] fraudulently use…[AWP]…widely considered to be artificially inflated" to inflate brand-name drug prices and "to encourage use of drugs with higher AWP price" because they "pocket the spread."); Darren M. Allen, *Probe of Express Scripts Called For*, THE TIMES ARGUS, Jul. 9, 2003 (discussing how states have accused Express Scripts and other PBMs and drug companies of "collusion in setting [AWPs] that allow for inflated spreads that "were not contemplated, regulated, or revealed' in…contract"); Elizabeth MacDonald, *Drug Lord*, FORBES, Feb. 16, 2004 ("The manufacturers…publish inflated wholesale prices.  Then they cut secret discount deals with the middlemen [PBMs].")

Plaintiff also argues that the prior disclosures fail to serve as a bar to his claim because they don't include all the essential elements of the claim, including damages, and none of the prior allegations included a theory of harm to the Government.  See Mistick, 186 F. 3d at 388 (a public disclosure must contain either all the allegations set forth in the qui tam action, or all of its essential elements); United States ex rel Smart v. Christus Health, 626 F. Supp. 647, 653-54 (S.D. Tex 2009) (public disclosure does not arise in cases where the predicate violation has been publicly disclosed elsewhere, but no allegations have been made of "claims upon the Government, false or otherwise").  Plaintiff points out that none of the prior disclosures mention the 4.16% differential that is the crux of his argument.  Plaintiff also cautions that when analyzing a qui tam complaint for public disclosure, a court must avoid abstracting the allegations to such a high altitude of generality that a case with "genuinely new and material information" is wiped out.  United States ex rel. Goldberg v. Rush U. Med. Ctr., 680 F. 3d 933, 936 (7th Cir. 2012).

### e. Public Disclosure Bar Analysis

The Court finds the evidence of prior disclosures presented by Defendants to be persuasive.  Allegations from prior congressional reports, the news media and civil complaints are clearly within the parameters of the Public Disclosure Bar.  As to the PBM Defendants, Relator alleges that they knew that "the inflated AWP from First Databank fraudulently inflated [their] profits" and that by "consistently choosing First Databank as the pricing source for AWP" they "maximize[d] [their] own revenue and profits while increasing the net costs of FEHBP and other Government-funded health plans for brand-name drugs dispensed to members."  Compl. ¶¶ 58-59, FAC ¶¶ 64-65, TAC ¶¶ 163, 171.  The Court finds that these allegations are substantially similar to those in the complaints filed in the Fidelity and Brown Litigations before Relator

disclosed any allegations to the Government and before Relator filed his original complaint on March 28, 2005.

For example, Fidelity's Second Amended Complaint, filed on August 16, 2004, alleges that ESI "knew or should have known that First Databank's [Blue Book AWP] pricing was inflated and thus did not represent the lowest possible AWP price available in the market" and that by choosing Blue Book over other sources of AWP pricing, ESI "maximized its revenue and profits while increasing the net costs to Fidelity for brand-name drugs dispensed to members." Second Am. Compl., <u>Fidelity Ins. Co., et al v. Express Scripts, Inc., et al.</u>, Civil Action No. 4:06-cv-1521 (E.D. Mo.), ECF No. 80 ¶¶ 108-109.  Similarly, the complaint filed in the <u>Brown</u> Litigation on October 28, 2004 alleges that ESI "knew or should have known that First Databank's pricing was inflated and thus did not represent the lowest possible AWP price available in the market" and that by "choosing [the Blue Book] as the pricing source for AWP, ESI maximized its revenue and profits while increasing the net costs to the Plaintiff Fund for brand-name drugs dispensed to Fund participants." Compl., <u>Brown, et. al. v. Express Scripts, Inc.</u>, Civil Action No. 3:04-cv-01822-AWT (D. Conn), ECF No. 1 ¶¶ 64-65.  Relator also alleges that the PBM Defendants orchestrated a scheme to "capture the spread" between the Blue Book and Red Book AWP's in which they calculated reimbursements to their government clients at a percentage off Blue Book AWP and to pharmacies at a deeper discount off AWP.  TAC ¶¶ 20-21.  These pricing spread allegations also appear in the previously filed <u>Brown</u> and <u>Fidelity</u> litigations. [14]

---

[14] *See* Second Am. Compl., *Fidelity* Litigation, ECF No. 80 ¶¶ 93, 97, 148 (ESI created a "secret" pharmacy spread "between the price ESI received from Fidelity for brand-name prescriptions and the price ESI paid to the participating retail pharmacy using Fidelity's funds for those prescriptions" that was kept for itself.); Compl. *Brown* Litigation, ECF No. 1 ¶¶ 46, 48 (ESI Created a "secret differential or 'spread' between the price it pays, using the Fund's assets, to the retail pharmacy and the price it then charges and collects from the Fund," and "pockets the difference between the actual cost of the prescription paid to the pharmacy and the higher (inflated) price charged to the Fund.").

Relator asserts that the previously filed complaints in the <u>Brown</u> and <u>Fidelity</u> Litigations are not substantially similar to his own because they do not allege harm to the Government. However, the Third Circuit has found that as long as the underlying allegations are substantially similar, the prior disclosures need not assert harm to the Government to serve as a bar to an FCA claim. <u>See</u> <u>United States ex rel. Feldstein v. Organon, Inc.</u>, 364 Fed. Appx. 738, 742 (3d Cir. 2010). In <u>Organon</u>, the Third Circuit held that the relator's "identification of one specific legal consequence of the alleged fraud - the possible submission of false claims to Medicare and Medicaid – does not change the substantially similar nature of the underlying allegations of fraud and concealment in each action." <u>Id.</u> As such, the Court finds the fact that the prior disclosures involved private parties to be of no consequence.

As to the Publisher and Wholesaler Defendants, the Court finds that the allegations of AWP inflation in the <u>Fidelity</u> and <u>Brown</u> Litigations as well as those in congressional reports and the <u>In re AWP</u> and <u>NEC</u> Litigations are prior disclosures sufficient to bar Relator's claims. Relator's allegation of a 4.16% differential between Blue Book and Red Book AWP does not appear to be a new discovery. There is evidence that historically AWPs were reported at either a 20% or 25% markup over the WAC. As Defendants point out, the percentage difference between an AWP based on a 20% markup and one based on a 25% markup will always be 4.16%. Therefore, the 4.16% differential is simply indicative of a 25% markup over WAC as compared to a 20% markup. <u>See</u> <u>In re Pharm. Indus. AWP Litig.</u>, 491 F. Supp. 2d at 30 ("Historically, there was an industry-wide formulaic 20 or 25 percent markup between WAC and AWP."). This fact was also disclosed in an August 30, 2004 congressional report, mentioned

above, which noted the shift in AWP drug prices from 20% to 25% beginning in 2001 and 2002, the same time period alleged by Relator.[15]

The Court points to the following allegations made by Relator: (1) "At least as of 2001, and possibly earlier, McKesson, Cardinal Health, and AmerisourceBergen have been conspiring with First Databank to inflate the spread between the WAC and the AWP." SAC ¶ 79; (2) "First Databank (and for a time, Medi-Span, a subsidiary it later divested), at the urging of wholesaler McKesson, intentionally inflated Blue Book's published AWP over Red Book's numbers, creating an increasingly uniform 'spread' between the two." TAC ¶ 9; and

> (3) "McKesson and First Databank implemented and perpetrated this fraudulent scheme while publicly representing they maintained an arms-length relationship…First Databank represented that it performed sophisticated statistical 'surveys' of actual prices being charged by wholesalers in the marketplace, and that it mathematically weighted the results of the data obtained from these surveys to arrive at a reasonable empirical value for average wholesale prices in the marketplace… In reality, First Databank was not conducting formal mathematical or statistical surveys…First Databank's "surveys" were nothing more than occasional, anecdotal telephone calls to employees of some wholesalers, primarily McKesson.

TAC ¶¶ 11-14. The Court finds that these allegations are substantially similar to those in the June 2, 2005 Complaint filed in the <u>NEC</u> Litigation, nearly six months before McKesson, Medispan and ABC were added as Defendants to Relator's SAC. For example, the Complaint in the <u>NEC</u> Litigation alleges that

> In approximately late 2001 or early 2002, unknown to payors in the pharmaceutical marketplace, First Data and McKesson reached agreement on how the WAC to AWP markup would be established for hundreds of brand-name drugs. As part of this agreement, First Data, to the extent it relied on information other than that provided directly from various drug manufacturers for specific drugs, used the WAC-to-AWP markup provided only by McKesson as the basis for its published AWP and did not 'survey' any other wholesalers. And at the same time, McKesson, without any economic justification, raised the WAC-to-AWP spread to 25%.

---

[15] *See Medicaid Prescription Drug Reimbursement: Why the Government Pays Too Much*: Hearings before the Subcomm. on Oversight and Investigations of the H.R. Comm. On Energy and Commerce, 108th Cong. 12, 13-71 (2004).

NEC Compl. ¶¶8-9.  The allegations in the NEC complaint are nearly identical to those made by Relator and appeared before Relator included the McKesson/First Databank conspiracy theory in his SAC.  As such, the NEC Litigation is a valid prior public disclosure and serves to bar Relator's FCA claims.

Even though each Defendant may not appear in the prior disclosures discussed, as long as the Defendant is identifiable, the prior public disclosure is valid as to that Defendant.  United States ex rel. Zizic v. Q2Administrators, LLC, 728 F. 3d 228, 238 (3d Cir. 2013) (affirming dismissal of FCA claims under public disclosure bar because realtor's allegations were substantially similar to prior public disclosures and even though the earlier disclosures did not reference specific defendants the public disclosure bar applied to those defendants because they were directly identifiable from that public disclosure).  Medi-span is identifiable because it is one of only three pharmaceutical publishers who publish AWP and it was at one time owned by FDB.  ABC is directly identifiable from the NEC Litigation because it was one of the wholesalers that FDB purported to survey.  Medco and Caremark are identifiable because they, along with ESI, make up the three PBMs who, according to Relator, "dominate the market." TAC ¶ 149.  Thus, based on the above, the Court finds the Public Disclosure Bar applies to all Defendants unless Relator is deemed an original source of the allegations.

### f.  Original Source

The Public Disclosure Bar does not apply if the relator bringing the *qui tam* action is an "original source" of the information alleged in the lawsuit.  31 U.S.C. § 3730(e)(4)(A).  "Original source" is defined as "an individual who has direct and independent knowledge of the information on which the allegations are based and has voluntarily provided the information to the Government before filing an action under this section which is based on the information."  31

U.S.C. § 3730(e)(4)(B).  The Third Circuit has "interpreted direct to mean 'marked by absence of an intervening agency, instrumentality, or influence: immediate.'" Paranich, 396 F.3d at 335 (quoting United States ex rel. Stinson, Lyons, Gerlin & Bustamante, P.A. v. Prudential Ins. Co., 944 F.2d 1149, 1160 (3d Cir. 1991).   To be "direct," the "knowledge must have arisen from [relator's] 'own efforts, ... not by the labors of others, and ... [must not be] derivative of the information of others.'" Feldstein, 364 Fed. Appx. at 743 (citation omitted) (finding relator was not an original source because he did not personally witness or participate in the alleged fraud, but acquired knowledge from emails and conversations with other employees).

"[T]he relator must possess substantive information about the particular fraud, rather than merely background information which enables a putative relator to understand the significance of a publicly disclosed transaction or allegation." Stinson, Lyons, Gerlin & Bustamante, 944 F.2d at 1161 ("The paradigmatic 'original source' is a whistleblowing insider.  This covers ... individuals who are close observers or otherwise involved in the fraudulent activity.") (internal quotation marks and citation omitted).  The Third Circuit has cautioned that "courts must be mindful of suits based only on secondhand information, speculation, background information or collateral research." Atkinson, 473 F.3d at 523 (internal quotation marks and citation omitted).   Further, "[a] relator ... cannot establish that he is an original source solely by relying on unsupported, conclusory allegations." United States ex rel. Pritsker v. Sodexho, Inc., Civ. No. 03-6003, 2009 WL 579380, at *13 (E.D. Pa. Mar. 6, 2009) (internal quotation marks and citation omitted), aff'd, 364 Fed. Appx. 787 (3d Cir. 2010).

The Court finds that Relator does not have direct and independent knowledge of the information presented in his complaints and is therefore not an "original source."  "The False Claims Act is intended to encourage individuals who are either close observers or involved in the

fraudulent activity to come forward, and is not intended to create a windfall for people with secondhand knowledge of the wrongdoing." U.S. ex rel. Kinney v. Stoltz, 327 F. 3d 671, 674 (8th Cir. 2003). The relator's direct knowledge also must be that the defendants committed the fraud – general knowledge that fraud was occurring will not suffice. Id. at 675. Thus, a relator cannot base his allegations on "speculation or conjecture" that a defendant engaged in wrongdoing. United States ex rel. J. Cooper & Assocs. V. Bernard Hodes Group, Inc. et al., 422 F. Supp. 2d 225, 236 (D.D.C. 2006).

The Court finds that Morgan was not a "close observer" or "involved" in the alleged fraud. He did not work for any of the Defendants and does not allege facts from which it can be inferred he had access to non-public information about the Defendants. Rather his knowledge is based on his purported "independent investigation." TAC ¶ 172. But to be "direct," a relator's knowledge must be "immediate" and "first-hand." Feldstein, 364 Fed. App'x at 743. In holding that knowledge was not "direct" in Feldstein, the Third Circuit underscored the fact that the relator did not "personally witness" or participate in the alleged fraud. Id. Here, Relator did not personally witness or participate in any of the events that underlie the allegations in his complaint. Relator acquired the information underlying the crux of his complaint – that FDB published an AWP inflated by 4.16% over Red Book – by simply comparing two publicly disclosed numbers. This seems to be the type of secondhand, collateral research the Third Circuit cautioned against in Atkinson. In addition, for many of the Defendants, particularly Medi-Span, ABC, Medco and Caremark, the TAC does not demonstrate that Morgan had any direct knowledge of any alleged wrongdoing. There is no indication in the TAC as to how Morgan obtained the information against these particular Defendants and as such, Morgan's allegations appear to be based purely on speculation and conjecture.

23

The Court also finds that Morgan's knowledge is not independent.  First of all, some of Morgan's knowledge was likely obtained while working as a consultant and expert witness in the Fidelity Litigation.  In addition, to be "independent" Morgan's knowledge cannot be dependent on a public disclosure.  Feldstein, 364 Fed. App'x at 743.  Courts look at the evolution of a relator's allegations to determine whether the relator's knowledge is truly independent of prior disclosures.  See United States ex rel. Repko v. Guthrie Clinic, P.C. et al., No. 3:04cv1556, 2011 WL 3875987, at *16 (M.D. Pa. Sept. 1, 2011).  For example, in Repko, the relator alleged certain illegal financial relationships.  Id. at *5-6.  However, "Relator's original complaint did not contain any of the information related to [the] allegedly illegal financial transactions that he raised in his amended complaint."  Id. at *16.  Only after the financial transactions became "widely available and publicly disclosed" did the relator file an amended complaint in which his "claims changed and began to echo" the newly disclosed information.  Id.  Accordingly, the court concluded the relator's knowledge of the transactions was not independent of the disclosures, and thus he was not an original source.  Id.

Likewise, starting in November 2006, Morgan's claims changed to "echo material widely available and publicly disclosed."  Originally, the complaint alleged a conspiracy between ESI and FDB whereby FDB inflated AWPs, and ESI used its contracts to capitalize on the spread between AWPs in FDB and the Red Book.  Then, late in 2006, after plaintiffs in the NEC Litigation and several news organizations made disclosures of an alleged scheme between wholesalers and AWP publishers to inflate the WAC-to-AWP markup, Morgan filed his SAC significantly altering his theory.  For the first time, Morgan alleged a scheme between wholesalers and AWP publishers to inflate the spread between WAC and AWP.  Previously, Morgan had not implicated any of the Wholesaler Defendants.  As Relator's knowledge of the

information presented in his complaints is not direct or independent, the Court finds that Relator

is not an original source of the allegations.  As such, the FCA's Public Disclosure Bar divests this

Court of jurisdiction and Relator's FCA claims (Counts One through Four) are dismissed

pursuant to Fed. R. Civ. P. 12(b)(1).

### g.  Ancillary Allegations Against PBM Defendants

Under the heading "Other Pricing Schemes by Medco, ESI and Caremark in their Contracts

to Provide Services to the Government," (TAC ¶¶ 198-225) Morgan asserts additional allegations

against the PBM Defendants (the "Ancillary Allegations"), under the FCA, including that they

engaged in duplicate billing, overbilling and other fraudulent practices.  The Court finds that the

Ancillary Allegations are too vague and conclusory to state a plausible entitlement to relief under

12(b)(6), let alone under the more exacting requirements of Rule 9(b).  These allegations do not

identify any specific false claim or record submitted to the Government and consistently use the

term "PBM Defendants" in lieu of a specific reference to ESI, Medco or Caremark.  The

allegations also fail to describe the contracts purportedly giving rise to relief with any level of

detail or to identify a single government agency that the PBM Defendants submitted false claims

to.  The Court also lacks jurisdiction to consider the Ancillary Allegations under the Public

Disclosure Bar because they are based upon public disclosures and Morgan is not an original

source of the information.[16]

---

[16] *Compare* TAC ¶¶ 199-206 *with* Compl., *Brown* Litigation ¶¶ 72, 97 (duplicate billing allegations); *Compare* TAC ¶¶ 207-10 *with* Second Am. Compl., *Fidelity* Litigation ¶ 126 (refilling allegations); *Compare* TAC ¶¶ 211-214 *with* Second Am. Compl., *Fidelity* Litigation ¶ 125 (invalid physician/DEA authorization allegations); *Compare* TAC ¶¶ 215-16 *with* Second Am. Compl., *Fidelity* Litigation ¶¶ 98-101 (overbilling allegations); *Compare* TAC ¶¶ 222-24 *with* Second Am. Compl., *Fidelity* Litigation ¶¶ 110-15, 121-22, 146, 155-59 (rebate allegations); and *Compare* TAC ¶ 225 *with* Second Am. Compl., *Fidelity* Litigation ¶ 125 (positive adjustment allegations)

### h. Common Law Claims (Counts Five, Six and Seven)

The Court agrees with the ESI Defendants that the fifth, sixth, and seventh causes of action in the TAC are simply common law claims for breach of contract, breach of the duty of good faith and fair dealing, and breach of fiduciary duty that Morgan dressed up with false claims headings. The Court finds that Morgan lacks standing to bring these common law claims on the Government's behalf. See United States ex rel. Mayman v. Martin Marietta Corp., 894 F. Supp. 218, 226 (D. Md. 1995) ("A relator has standing under the [FCA] either because of his financial stake in the outcome or because Congress statutorily assigned him part of the Government's cause of action . . . . Neither situation applies in the context of breach of contract and common law claims where Congress has not granted the Relator any comparable rights."). Morgan cannot confer standing upon himself to bring common law claims simply by adding the words "presentation of false claims" to the allegations or to the headings. Therefore, Counts Five, Six and Seven of the TAC are dismissed.

### i. State Law Claims

As Relator's federal claims have been dismissed, the only remaining claims are those brought under the various state false claims acts. A district court is permitted to decline the exercise of supplemental jurisdiction "if the district court has dismissed all claims over which it has original jurisdiction." See Kach v. Hose, 589 F.3d 626, 650 (3d Cir. 2009) (noting that a decision "to retain or decline jurisdiction over state-law claims" should be "based on considerations of 'judicial economy, convenience and fairness to litigants'"). The Court finds that in the interests of fairness, judicial economy and convenience, it is appropriate to decline supplemental jurisdiction over the state claims. In the absence of a viable federal claim, each local forum should have the opportunity to apply its own laws to the claims advanced by Morgan. The Court therefore declines to exercise jurisdiction over the state law claims in

accordance with 28 U.S.C. ¶ 1367 (c).  See United Mine Workers of Am. v. Gibbs, 383 U.S. 715, 726 (1966) ("Certainly, if the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well."); United States, ex rel. Piacentile v. Sanofi Synthelabo, Inc., Civ. No. 05-2927, 2010 WL 5466043, at *10 (D.N.J. Dec. 30, 2010) (declining to exercise supplemental jurisdiction over state law claims after dismissing federal FCA claims).

## IV.    CONCLUSION

For the foregoing reasons, the Motions to Dismiss brought by (1) ESI and Medco (ECF No. 147); (2) Medi-Span (ECF No. 148); (3)&(4) ABC (ECF Nos. 154, 161); (5) Caremark (ECF No. 159); and (6) FDB (ECF No. 160) are **granted** and Relator's TAC is **dismissed**.  An appropriate Order accompanies this Opinion.

Dennis M. Cavanaugh, U.S.D.J.

Date:            December ___, 2013
Original:       Clerk's Office
cc:              Hon. Joseph A. Dickson, U.S.M.J.
                 All Counsel of Record
                 File

27